BECKER, GLYNN, MUFFLY,
CHASSIN & HOSINSKI LLP
299 Park Avenue
New York, New York 10171
(212) 888-3033
Alec P. Ostrow
aostrow@beckerglynn.com

*Attorneys for Plaintiff, Jeffrey Solomon Simpson, as Debtor and Debtor in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>JEFFREY SOLOMON SIMPSON,<br><br>Debtor. | Chapter 11<br><br>Case No. 26-10359 (LGB) |
| JEFFREY SOLOMON SIMPSON, as Debtor and Debtor in Possession,<br><br>Plaintiff,<br><br>- against -<br><br>ARCH REAL ESTATE HOLDINGS LLC, ARCH ASSET MANAGEMENT LLC, and ARCH PROPERTY MANAGEMENT LLC,<br><br>Defendants. | Adversary No.<br><br>**DECLARATION OF JEFFREY SOLOMON SIMPSON IN SUPPORT OF MOTION FOR <u>PRELIMINARY INJUNCTION</u>** |

Jeffrey Solomon Simpson, hereby declares under penalty of perjury, pursuant to 28 U.S.C. § 1746(a), as follows:

1. I am the Debtor and Debtor in Possession in this bankruptcy case and the plaintiff in this adversary proceeding. I make this declaration in support of my motion for a preliminary injunction. I am fully familiar with the facts set forth herein.

## Background

2. The circumstances leading to the filing of the my chapter 11 petition derive from my interest in and operation of a group of real estate holding and operating companies known as the "Arch Companies." At their peak, the Arch Companies managed or controlled real estate valued in excess of $1 billion across the United States. The Arch Companies are composed of numerous affiliated operating and investment entities, including an operating company and a holding company for each real property. In the aggregate, there were approximately 125 third-party investors in the Arch Companies' properties in addition to myself, my family, and other related parties. The structure of the Arch Companies necessarily required me to be a fiduciary for the benefit of all parties and there were provisions that limited AREH's Managing Member role to prevent its benefiting financially for itself or its members without the consent of other parties, except as expressly set forth in the applicable documents.

3. The following is a simplified version of a complex corporate structure for the Arch Companies. In general, the Arch Companies' properties were managed by AREH, as a non-member manager of the separate limited liability companies owning or operating the properties. Prior to the litigation described below, I was the sole person, corporately through JJ Arch LLC ("JJ Arch"), directing the operations of AREH and hence had direct supervision over all the Arch Companies' properties and business affairs.

4. AREH, in turn, had two members, JJ Arch, the managing member had an 80% interest, and 608941 NJ Inc. ("Oak"), an investor member, had a 20% interest with a sunset provision after a 5-year exclusivity period. Oak is subsidiary of 35 Oak Holdings Ltd. ("35 Oak"). In the Arch Companies' business model, Oak's purpose was not managerial. It had only the ability to veto certain major decisions and/or transactions. Its purpose was to provide loan

guarantees and seed equity alongside funding provided by me, Jared Chassen, a minor owner of JJ Arch, the families of me and Mr. Chassen, and a few key employees. Oak's main benefit was to receive 50% of all property-related profits in return for the contractual obligations it undertook until its exclusivity expired in 2022.

5. Oak is a New Jersey corporation with a principal place of business in Toronto, Canada. Its principals are Kevin Wiener, William Wiener, and Michael Weiner. In the corporate structure for each of the Arch Companies' properties, the holding company was owned by JJ Arch or a company controlled by JJ Arch and Oak or an affiliate of Oak or the Weiner family, and the property owner was owned by the holding company and several independent investors. The economics of the Arch Companies, including the distributions of profits, were controlled through a separate company, Arch Property Holdings I ("ARPH I"), which is a party to various operating agreements and of which Oak served as the Class A member, JJ Arch as the Class B member, which is the managing member, and two former key employees, Michelle Miller and Tristan Last, were Class C members. I also permitted a few other key employees to invest from time to time. ARPH I operated in conjunction with JJ Arch to control property-based distributions.

6. From the outset and at all relevant times, I was majority owner and managing member of JJ Arch. The only other minority owner was Mr. Chassen. As discussed below, Mr. Chassen's interest in JJ Arch was initially modified by amendment in 2021 and then divested in 2023, pursuant to the terms of the JJ Arch operating agreement, which I have referred to as both a resignation and a deemed resignation, based on his non-compliance with his financial obligations and his collusive relationship with Oak, which was not permitted by his agreement with JJ Arch, and manifested by his Common Interest, Joint Prosecution and Joint Defense

Agreement with 35 Oak, dated August 6, 2023, but made effective *nunc pro tunc* as of August 3, 2023, an agreement I did not see until it was produced to me in litigation about two years after it was entered into. This agreement, combined with a purported "settlement" email, dated July 19, 2023, sent by Oak's counsel, illuminates a scheme by Oak, in which Mr. Chassen participated, to strip me from my interests in the Arch Companies and JJ Arch. Since Oak had no contractual ability to control any of the investment entities, the only path to get the control they sought was through JJ Arch and Mr. Chassen's minority interest in JJ Arch. The Common Interest, Joint Prosecution and Joint Defense Agreement combined with the purported "settlement" email also resulted in a de facto merger of JJ Arch and AREH with Oak in control that violated the agreements AREH and its affiliates had entered into with the third-party investors. Oak sought to exercise control through Mr. Chassen's apparent authority at JJ Arch, even though an amendment to the JJ Arch Operating agreement provided that Mr. Chassen had no significant managerial authority. As discussed below, I also fired Mr. Chassen. (The interplay among resignation, dissolution, deemed resignation, and firing has been the subject of considerable litigation filings, and need not be elaborated in this complaint.)

7. Although I maintained managerial control of JJ Arch, my ownership interest in JJ Arch was transferred to YJ Simco in 2022. Mr. Chassen also transferred his interest to a separate entity for reasons he described to me as estate planning purposes.

8. As the relationship with Oak was reaching its contractual sunset, I began the process of establishing myself as the sole future guarantor for AREH's properties. My lawyers, accountants, and internal team helped me start to build up a family office structure using YJ Simco, along with a proposed family trust for the benefit of my wife and children. Given the need to have a bankable balance sheet for institutional lenders' financial requirements, I started

purchasing properties directly with my wife and through JJ Arch. In the last AREH acquisition, which involved property in Palm Beach, Florida, I was able to satisfy a lender to use my personal guaranty as the sole guaranty of property to be acquired by AREH, but Oak's guaranty was nevertheless included, even though not required.

9. Starting in late 2022, owing to financial turmoil in the global real estate investment and lending markets due to high inflation and exceptional interest rate growth, and coincidentally as Oak's period of exclusivity was ending, substantial disagreement developed among Oak and JJ Arch regarding me as the only controlling person in the Arch Companies. In particular, I took part in a presentation to Oak in November of 2022, forecasting to August of 2023, that demonstrated significant potential future capital needs which Oak would be required to fund pursuant to its agreements and loan guarantee obligations. Despite its contractual obligations, Oak refused to provide the required funding. Although other investors, including Mr. Chassen and me, had the right to fund and could have chosen to fund, they did not have the requirement or responsibility to do so. I spent six months working with outside counsel, Y. David Scharf of Morrison Cohen, his internal team, and separate lender and investor groups trying to find solutions for Oak's unwillingness to fund. By mid-2023, the loans were imbalanced due to the increase in interests rates, and the lack of funding of equity caused a lack of lender fundings. Oak nevertheless demanded that the projects continue on the credit and good name AREH had in the market, and this resulted in $25 million of unpaid obligations across the AREH portfolio within 90 days. I, as managing member of JJ Arch, the managing member of AREH, and with Mr. Chassen's knowledge, also worked with an outside corporate attorney, Len Breslow of Breslow & Walker, who suggested that the only options for AREH were to source a new partner, dissolve, or to file for bankruptcy. I, as managing member of JJ Arch, the

managing member of AREH, and with Oak's consent, hired a broker to explore the first two options. Also under consideration was the dissolution of AREH and its affiliates. Oak was aware of this, and it worked to sabotage the broker's efforts, by, among other things, working with Infinity, an existing partner of AREH, of principal of which, David Berg, is a cousin of Mr. Chassen's.

10. As a result, I, as managing member of JJ Arch, the managing member of AREH, proposed exploring a possible bankruptcy filing of AREH and related entities. Since I could not come to terms with Oak, Oak gave me two options: (1) Give the keys to the properties back to their respective lenders to allow Oak to seek guarantee relief; and (2) Oak would borrow funds, but I had to change the distribution waterfall on the properties to Oak's benefit (and to the detriment of the independent investors), a change that was prohibited by the relevant documents. In mid-July 2023, Oak decided that it would push me out of the Arch Companies and use Mr. Chassen to implement this plan, a maneuver that would result in substantial defaults under all lender and investor agreements, which provide for me to be a key principal and controlling party. A July 19, 2023 "settlement" email sent by counsel for Oak to Mr. Breslow illustrates both Oak's motive and the blueprint for what ultimately followed. This "settlement" email caused an immediate conflict between Mr. Chassen and me. Mr. Chassen refused my request to say "no" to Oak, and I fired him, after trying to work with him for almost two weeks, because I, as a fiduciary to the other parties, felt I had no choice. Oak's principals resisted the firing of Mr. Chassen and the potential bankruptcy filings for AREH and related entities because they believed that bankruptcy filings would trigger numerous corporate and personal guarantees they had issued in connection with the Arch Companies' properties. Subsequently, 35 Oak and Mr. Chassen entered into the Common Interest, Joint Prosecution and Joint Defense Agreement,

described above, to allow their attorneys to share confidential attorney-client matter because they determined that their economic interests were aligned and contrary to mine. Litigation over the control of the Arch Companies eventually ensued. Some, but not all, of this litigation and the activities in the litigation will be described below.

11. I fired Mr. Chassen on August 5, 2023, in furtherance of his plan with Oak, he took several unauthorized actions against me in connection with the Arch Companies. In particular, Mr. Chassen misled a banking institution into removing my access to the bank accounts of AREH, JJ Arch, YJ Simco, and affiliated companies, and amazingly, the accounts belonging to me and my family, at First Republic Bank. Mr. Chassen misled an information technology consultant into removing my access to company email and electronic records, and Mr. Chassen arranged to deactivate my physical access to the Arch Companies' office.

12. Oak initiated litigation against me in the District Court for the Southern District of New York on August 10, 2023, alleging, among other things, breach of fiduciary duties, tortious interference with prospective business advantage, and defamation, This case was later withdrawn by Oak, approximately six months after it was commenced. In October of 2023, Oak intervened in the 158055 Action (defined below).

13. On August 14, 2023, I commenced an action in the Supreme Court of the State of New York, County of New York, Index No. 158055/2023 (the "158055 Action") individually and derivatively as managing member of JJ Arch, and in turn, derivatively as managing member of AREH against Mr. Chassen and First Republic Bank, which sought to restore my access to the Arch Companies' accounts and re-establish my control over AREH. Oak was not named in this action, although it later intervened. I came to learn that Oak had funded Mr. Chassen's legal fees in this action, in excess of $250,000 to start, even hiring the firm of Fried, Frank, Harris, Shriver

& Jacobson LLP to represent Mr. Chassen, a firm that had worked for AREH while I was in control of AREH.

14. After I achieved some initial success in the 158055 Action in restoring my access and managerial rights, Oak intervened and with Mr. Chassen's support sought the temporary appointment of a receiver and a preliminary injunction to be installed as the managing member of AREH, while continuing to resist its obligations to fund the Arch Companies and continuing to make threats against me when I pressed the possibility of an AREH bankruptcy petition. Even though Mr. Chassen admitted to his "self-help" initiatives, the state court allowed him back in the business and eventually enjoined me from removing him, but did not and could not prevent Mr. Chassen from having resigned by virtue of his own actions.

15. Even though Oak told me that it was not involved with Mr. Chassen's earlier activities, Oak quickly persuaded Justice Joel M. Cohen in the 158055 Action to issue a preliminary injunction to install Oak as the temporary managing member of AREH by November of 2023, and enjoined the Debtor from engaging in managerial activities for AREH. The November 3, 2023 order provided that "Oak will serve as acting managing member of AREH, owing all applicable duties to AREH and its members." As a result, the order required Oak to be a fiduciary to me, but Oak has not provided any information to me or observed the duties to JJ Arch as required by the AREH Operating Agreement. The results of Oak's management of AREH have been catastrophic, as illustrated by proofs of claim filed in my chapter 11 case. Bills have gone unpaid and Arch Companies' properties have gone into foreclosure or been disposed of through deeds in lieu of foreclosure, engineered by Oak in exchange for guarantee relief, transactions prohibited by the relevant agreements in the absence of consent from investors as well as from me in my capacity as the sole representative of the

managing member of the relevant investment entities in the corporate structure. Oak has also withheld distributions to JJ Arch or me as required by the AREH Operating Agreement.

**The State Court Lawsuit Against My Wife and Our Entities**

16. In June of this year, AREH and two of its subsidiaries (collectively, the "Arch Entities"), filed a lawsuit in the Supreme Court of the State of New York, County of New York, Index No. 653216/2026 (the "State Court Action") against my wife, YJ Simco LLC ("YJ Simco"), other entities that she or we own, and the law firm that represents me in my bankruptcy case, Becker, Glynn, Muffly, Chassen & Hosinski LLP ("Becker Glynn"). One of these entities, 1055 Park Ave ST LLC ("ST LLC") is the entity issued a guaranty (the "Guaranty") and a mortgage (the "Mortgage") on a condominium unit that it owns to secure in part the compensation and reimbursement of expenses of Becker Glynn for representing me in my bankruptcy case. Indeed, this Guaranty and Mortgage was part of the financial arrangements that induced Becker Glynn to agree to represent me in light of my depleted resources resulting from the actions of Oak and Mr. Chassen described above. The State Court Action seeks to invalidate the Guaranty and Mortgage, thus imperiling my ability to continue with counsel in this bankruptcy case. As set forth in the Arch Entities first amended complaint ("FAC") in the State Court Action, the Guaranty and Mortgage are attacked on various grounds, including as voidable fraudulent transfers by ST LLC, and on the grounds that my wife does not own ST LLC, despite the affidavit submitted to Becker Glynn and the declaration submitted to this Court saying that she does own ST LLC. Based on the fraudulent transfer allegations, the State Court Action seeks a judgment against my wife for attorneys' fees. It also seeks a money judgment against the entities based on a manufactured claim that because when I was in charge of AREH, I asked its

employees to help me out with work for my personal benefit and the benefit my non-Arch-related entities that I directly or indirectly owned.

17. Although the claims asserted in the FAC are based in large part on my actions and my conduct, the Arch Entities did not choose to sue me in this Court. Rather, they chose to sue the others in state court, not naming me because of the automatic stay. Doing so enabled the Arch Entities to have their case heard by Justice Cohen, as related to the 158055 Action.

18. The claims in the FAC to establish a debt against ST LLC and the other entities, a fraudulent transfer of the Guaranty and Mortgage and mortgage to Becker Glynn, and a claim of attorneys' fees against my wife, are not only completely without merit, they also, in my view, represent an attempt to circumvent the jurisdiction of this Court on matters crucial to my chapter 11 case, including my ability to continue with Becker Glynn as my counsel, by seeking to invalidate the financial arrangements that enabled Becker Glynn to agree to represent me here.

19. Among the reasons that the claims in the FAC are completely without merit is the AREH Operating Agreement itself, a copy of which is attached hereto as Exhibit 1, which contains a provision in the Indemnification article, Section 13.1.1, that states the following:

> 13.1.1. No Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) ("Indemnifying Member") shall have any liability to the Company or to any other Member for any loss suffered by the Company or any other Member unless loss arises out of the willful misconduct or fraud or such Indemnifying Member; provided, however, that this Section 13.1.1 shall not limit, restrict or otherwise affect the rights or obligations of a Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) under this Agreement or any other agreement to which it is a party.

Obviously, I am an Indemnifying Member under Section 13.1.1 and therefore, I have no liability to the Company [AREH] for asking AREH employees to help me out with work for my personal benefit and the benefit my non-Arch-related entities that I directly or indirectly owned, because that was neither willful misconduct nor fraud on my part and the proviso does not apply.

20. Another reason that the claims in the FAC are completely without merit is the participation of AREH employees in connection with my financial affairs and those of my non-Arch-related entities that I directly or indirectly owned was not at my request. Rather, it was because I was a key principal in many of the Arch companies' loan agreements, and the AREH accounting team needed to know my financial status to meet covenant obligations. Every time a new loan was processed at the Arch companies, my credit was run. And since Oak, as of 2022, was no longer going to be a contributing member on any new activity, there was an even greater need in the Arch companies for the accounting team to know my finances to assist me in making presentations to get loans that were critical to carrying on the Arch companies' business.

21. Moreover, in my view, the State Court Action represents another action in a pattern of harassment against me and my family by Oak, and now the Arch Entities, which are controlled by AREH, which is controlled, as a result of orders from Justice Cohen, by Oak. Other prior litigation in this pattern of harassment include ARCH's lawsuit against Great American Insurance Company ("Great American"), Index No. 652914/2024, for funding lawyers representing JJ Arch in its chapter 11 bankruptcy case, which was consolidated into Great American's insurance interpleader action, Index No. 653208/2024, which I sought unsuccessfully to remove to this Court after my chapter 11 filing. Both of these cases also managed to end up before Justice Cohen. Another case is an action brought by Oak in the New York Supreme Court before Justice Cohen, Index No. 654963/2023, which sought to prevent me

from filing a chapter 11 petition for AREH. That case was removed to the Southern District of New York before Judge Carter, Case No. 1:23-cv-8966, where Oak withdrew it before Judge Carter could rule against Oak. Instead Oak intervened in the 158055 Action. Notably, in the 158055 Action, in an interim order, dated October 27, 2023, Justice Cohen added a footnote 3 opining on the issue before Judge Carter that I could be enjoined from filing a chapter 11 petition for AREH, but stating that he would "give due consideration to any decision rendered on this issue in the related lawsuit by Oak that was removed to the United States District Court for the Southern District of New York." As this Court is well aware, Oak and AREH seek to be before Justice Cohen on all matters related to me. The State Court Action is merely the latest example in this pattern of harassment.

22. Significantly, because of the allegations of Oak and AREH and the orders of Justice Cohen, I have been removed from the source of my income, as well as access to insurance coverage. My wife, ST LLC, and the other non-Becker Glynn defendants in the State Court Action have sought to retain counsel, but have been able to do so because they lack the funds necessary to pay a retainer sought by prospective counsel. Prior to August 2023, my wife, ST LLC, and the other non-Becker Glynn defendants in the State Court Action depended on me and my resources for funding of expenses, such as the retention of counsel to defend them in litigation. In light of my financial condition as a result of the actions of Oak, Mr. Chassen, and AREH since August 2023, as described above, I lack the resource to fund the litigation expenses of the non-Becker Glynn defendants. Moreover, as a result of my chapter 11 filing, I may not use estate resources for such purpose without permission from this Court.

## The Effect of the State Court Action on My Chapter 11 Case

23. As set forth above, the State Court Action seeks to invalidate the Guaranty and Mortgage granted to Becker Glynn, which was part of the financial arrangements under which Becker Glynn agreed to represent me in the chapter 11 case.

24. Moreover, Oak, which controls AREH, has amended its complaint in its dischargeability adversary proceeding against me to assert, among other things, the exact same claim against me that AREH is asserting in the State Court Action, namely, that I am liable to Oak for asking AREH employees to help me out with work for my personal benefit and the benefit my non-Arch-related entities that I directly or indirectly owned.

25. Significantly, because the FAC seeks to impose liability on my wife for attorneys' fees in connection with the alleged voidable transactions of the Mortgage and Guaranty, the basis of which allegations is my pre-August 2023 conduct, the Court can well understand that my ability and desire to devote energy to the reorganization process has been severely and adversely affected.

26. In addition, the inability of the non-Becker Glynn defendants to retain counsel due to lack of resources, which had been previously furnished by me, and the prospect of a default judgment being entered against the non-Becker Glynn defendants puts me at risk of losing the value of his direct and indirect equity interests in the entities, and most important, puts me at risk of not being able to support and protect his wife and his family.

27. To prosecute the chapter 11 case, I have been sent for my review and comments a draft chapter 11 plan and drafts of objections to four proofs of claim, which represents the first set of objections to claims. If the injunctive relief sought by this complaint is granted, I will be able to devote time and energy to proposing, confirming, and consummating a chapter 11 plan,

and reducing the amount and number of allowed claims entitled to distribution under such plan. Such plan will be confirmable within a reasonable period of time.

28. In light of the foregoing, I respectfully request that the Court grant the proposed order to show cause and temporary restraining order.

29. I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 24, 2026

Jeffrey Solomon Simpson



4925-8562-6323 v.1

Exhibit 1

**LIMITED LIABILITY COMPANY**

**OPERATING AGREEMENT OF**

**ARCH REAL ESTATE HOLDINGS LLC**

This LIMITED LIABILITY COMPANY OPERATING AGREEMENT (this "Agreement"), dated as of December 11, 2017, by and between 608941 NJ INC., a New Jersey corporation (together with its permitted successors and assigns, "Investor Member"), and JJ ARCH LLC, a New York limited liability company (together with its permitted successors and assigns, "JJ Member", and Investor Member and JJ Member, each a "Member", and collectively, the "Members").

WHEREAS, the Members desire to set forth their respective rights and obligations in respect of a limited liability company formed under the Act with the name of Arch Real Estate Holdings LLC (the "Company") on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the parties hereto set forth their agreement as follows:

ARTICLE I

**CERTAIN DEFINITIONS**

1.1. Certain Defined Terms. As used in this Agreement, in addition to the terms defined elsewhere herein, the following terms have the meanings specified below:

"Act" shall have the meaning set forth in Section 2.1.

"Acquisition Fees" shall mean all fees paid to the Company in connection with the acquisition of an asset by a Subsidiary or another Person.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, or portion thereof, after giving effect to the following adjustments:

(A) Credit to such Capital Account any amounts which such Member is deemed to be obligated to restore pursuant to the penultimate sentences in Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations; and

(B) Debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(*d*)(*4*), 1.704-1(b)(2)(ii)(*d*)(*5*) and 1.704-1(b)(2)(ii)(*d*)(*6*) of the Regulations.

The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(*d*) of the Regulations and shall be interpreted consistently therewith.

"Affiliate" of, or a Person "affiliated" with, a specified Person, means a Person that directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, the person or entity specified.

"Agreement" shall have the meaning set forth in the Preamble.

"Annual Budget" means the annual budget of the Company approved in accordance with Section 7.4 as the same may be modified in accordance herewith.

"Bankruptcy Action" means, with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged bankrupt or insolvent, or has entered against it an order for relief, in any bankruptcy or insolvency proceedings, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if within one hundred twenty (120) days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation or similar relief under any statute, law or regulation, the proceeding has not been dismissed, or if within one hundred twenty (120) days after the appointment without such Person's consent or acquiescence of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within one hundred twenty (120) days after the expiration of any such stay, the appointment is not vacated. The foregoing definition is intended to replace and shall supersede and replace the definition of "bankruptcy" set forth in Sections 18-101(1) and 18-304 of the Bankruptcy Act.

"Book Value" means with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(A) The initial Book Value of any asset contributed (or deemed contributed) to the Company shall be the gross fair market value of such asset at the time of such contribution;

(B) The Book Values of all of the Company's assets shall be adjusted to equal their respective gross fair market values (taking Code Section 7701(g) into account), as of the following times: (i) the acquisition of an additional Membership Interest in the Company by any new or existing Member in exchange for more than a de minimis capital contribution; (ii) the distribution by the Company to a Member of more than a de minimis amount of Company property as consideration for a Membership Interest in the Company; (iii) the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(*g*); (iv) the grant of an interest in the Company (other than a de minimis interest) as consideration for the provision of services to or for the benefit of the Company by an existing Member acting in a partner capacity, or by a new Member acting in a partner capacity or in anticipation of becoming a Member; (v) the issuance by the Company of a non-compensatory option (as such term is defined in Regulations Section 1.761-3(b)(2)) other than an option to acquire a de minimis interest in the Company; and (vi) at such other times as determined by the Tax Matters Partner; provided,

however, that the adjustments pursuant to clauses (ii), (iii), (iv) and (v) above shall be made only if the Tax Matters Partner determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company

(C) The Book Value of any item of Company assets distributed (or deemed distributed) by the Company to any Member shall be adjusted immediately prior to such distribution to equal the gross fair market value (taking Code Section 7701(g) into account) of such asset as of the date of distribution; and

(D) The Book Values of Company assets shall take into account any adjustments to the adjusted basis of any asset of the Company pursuant to Section 734 or Section 743 of the Code in determining such asset's Book Value in a manner consistent with Regulations Section 1.704-1(b)(2)(iv)(*m*).

If the Book Value of an asset has been determined or adjusted pursuant to clause (i), (ii) or (iv) above, such Book Value shall thereafter be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes, except that Depreciation shall be computed based on the asset's Book Value as so determined, rather than on its adjusted tax basis.

"Business Day" means any day other than Saturday, Sunday, any day that is a legal holiday in the State of New York, or any other day on which the banking institutions in New York are authorized to close.

"Capital Account" shall have the meaning set forth in Section 4.1.

"Capital Call Amount" shall have the meaning set forth in Section 3.2.1.

"Capital Call Notice" shall have the meaning set forth in Section 3.2.1.

"Capital Contribution" means any contribution made by a Member to the capital of the Company in accordance with this Agreement.

"Cash Flow" shall mean, for any period for which Cash Flow is being calculated, gross cash receipts of the Company (but excluding Capital Contributions (other than Capital Contributions made by JJ Member pursuant to Section 3.4) and Acquisition Fees), less the following payments and expenditures (i) all payments of operating expenses of the Company, (ii) all payments of principal of, interest on and any other amounts due with respect to indebtedness (including, without limitation, Reserves), leases or other commitments or obligations of the Company (including loans by Members to the Company), (iii) all sums expended by the Company for capital expenditures, (iv) all sums expended by the Company which are otherwise capitalized and (v) Reserves.

"Cause Event" means with respect to Managing Member (unless otherwise indicated) (i) willful misconduct in relation to the business or affairs of the Company or a Subsidiary, (ii) breach of fiduciary duty in relation to the business or affairs of the Company or a Subsidiary, (iii) gross negligence in relation to the business or affairs of the Company or a Subsidiary which results in a material loss to the Company or a Subsidiary or its Members as

such, (iv) a final non-appealable finding of fraud by a court of competent jurisdiction in any relation to any business of its affairs, (v) misappropriation of Company or Subsidiary funds or property, (vi) conviction, or a plea of nolo contendre, of Jeffrey Simpson any felony, (vii) any wrongful act or omission which results in an acceleration of any loan encumbering the Property, or (viii) any breach of a material provision of this Agreement which is not cured within 30 days of notice of such breach.

"Certificate of Formation" means that certain Articles of Organization of the Company, dated and filed with the Department of State of the State of New York on November 9, 2017.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company" shall have the meaning set forth in recitals.

"Company Asset" means all properties and assets that the Company may own or otherwise have an interest in, directly or indirectly, (to the extent of such interest) from time to time.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person or entity, which power may be subject to "major decision" approval rights in favor of a third party, whether such power is through the ownership of securities, by contract or otherwise.

"Damages" shall have the meaning set forth in Section 7.6.4.

"Default Loan" shall have the meaning set forth in Section 3.2.3.

"Depreciation" means, for each Fiscal Year, an amount equal to the depreciation, amortization, or other cost recovery deduction allowable for federal income tax purposes with respect to an asset for such Fiscal Year, except that (i) with respect to any asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year and which difference is being eliminated by use of the "remedial method" as defined by Section 1.704-3(d) of the Regulations, Depreciation for such Fiscal Year shall be the amount of Book Value recovered for such Fiscal Year under the rules prescribed by Section 1.704-3(d)(2) of the Regulations, and (ii) with respect to any other asset the Book Value of which differs from its adjusted tax basis for federal income tax purposes at the beginning of such Fiscal Year, Depreciation shall be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided, that in the case of clause (ii) above, if the adjusted tax basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero, Depreciation shall be determined with reference to such beginning Book Value using any method selected by the Tax Matters Partner.

"Dissolution Event" shall have the meaning set forth in Section 10.1.

"Due Diligence Materials" shall have the meaning set forth in Section 7.2.2.

"Eligible Asset" means any interest in real property either directly or indirectly through an ownership or leasehold interest including a preferred equity interest but excluding the origination or purchase of any debt financing unless such debt financing is being acquired or originated with the likely expectation that such debt financing will ultimately result in ownership of the collateral for such debt financing, and which is reasonably expected to satisfy the criteria set forth on Exhibit A hereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Exercise Period" shall have the meaning set forth in Section 7.9.2.

"Fiscal Year" shall be as set forth in Section 11.1.

"Guarantor Indemnitor" shall have the meaning set forth in Section 7.6.4

"Guaranty" or "Guaranties" shall have the meaning set forth in Section 7.7.1.

"Guaranty Indemnified Parties" shall have the meaning set forth in Section 7.6.4.

"Indemnifying Member" shall have the meaning set forth in Section 13.1.1.

"Indemnitee" shall have the meaning set forth in Section 13.1.2.

"Initiating Member" shall have the meaning set forth in Section 7.9.1.

"Investment Expiration Date" means the earlier of (i) the fifth anniversary of the date hereof; (ii) at such time as there are five Rejected Eligible Assets; (iii) the date on which none of Michael Wiener, William Wiener or Kevin Wiener controls Investor Member unless waived in writing by Managing Member; (iv) the date on which Jeffery Simpson no longer controls Managing Member unless waived in writing by Investor Member; or (v) the date on which the Investor Member and its Affiliates have made aggregate capital contributions, without giving effect to a return of any capital contributions, to the Company and its Subsidiaries equal to $50,000,000.00.

"Investor Member" shall have the meaning set forth in Preamble.

"Investor Member Maximum Capital Contribution" means $3,000,000.00.

"JJ Member" shall have the meaning set forth in the Preamble.

"JJ Member Promote Distribution" means an amount equal that portion of a Promote Distribution received by JJ Member and its Affiliate from a Subsidiary which is ultimately distributable to JJ Member or the equity holders of JJ Member. For example purposes, if an Affiliate of JJ Member receives a Promote Distribution of $100,000 and $40,000 of it is distributable to JJ Member and $60,000 distributable to an Affiliate of JJ Member and the

equity holders of JJ Member hold a 10% interest in such Affiliate, the JJ Member Promote Distribution will be $46,000 [$40,000 + (10% x $60,000)].

"Liquidating Agent" shall have the meaning set forth in Section 10.3.1.

"Major Decision" shall have the meaning set forth in Section 7.1.3.

"Managing Member" means JJ Member, or a replacement "managing member" appointed pursuant to Section 7.1.4.

"Member" shall have the meaning set forth in the Preamble.

"Membership Interest" or "Interest" shall mean, with respect to any Member, the entire membership interest of such Member in the Company, including all of a Member's rights and interests in, and obligations to, the Company in its capacity as a Member, all as provided in the Certificate of Formation, this Agreement and the Act, which Membership Interest reflects the interest of the Member in the Company, expressed as a percentage of the whole.

"Net Profits" and "Net Losses" means for any period the taxable income or loss, respectively, of the Company for such period, in each case as determined for federal income tax purposes, but computed with the following adjustments:

(i) items of income, gain, loss and deduction (including gain or loss on the disposition of any Company asset and Depreciation) shall be computed based upon the Book Value of the Company's assets rather than upon such assets' adjusted bases for federal income tax purposes;

(ii) any tax-exempt income received by the Company shall be deemed for these purposes only to be an item of gross income;

(iii) any expenditure of the Company described in Section 705(a)(2)(B) of the Code (or treated as described therein pursuant to Regulations under Section 704(b) of the Code) shall be treated as a deductible expense;

(iv) there shall be taken into account any separately stated items under Section 702(a) of the Code;

(v) if the Book Value of any Company Asset is adjusted pursuant to clauses (ii) or (iv) of the definition thereof, the amount of such adjustment shall be taken into account in the period of adjustment as gain or loss from the disposition or deemed disposition of such asset for purposes of computing Net Profits and Net Losses; and

(vi) items of income, gain, loss, or deduction or credit allocated pursuant to Section 5.2 shall not be taken into account.

"Non-Company Promote Interest" shall have the meaning set forth in Section 7.8.

"OFAC List" means the Specially Designated Nationals and Blocked Persons List maintained by the Office of Foreign Assets Control, Department of the Treasury and/or any other similar list maintained by the Office of Foreign Assets Control pursuant to any authorizing statute, executive order or regulation.

"Offer Notice" shall have the meaning set forth in Section 7.9.1.

"Permitted Transfers" shall have the meaning set forth in Section 8.2.

"Person" means an individual, a partnership, a corporation, an association, a joint stock company, a trust, a joint venture, a limited liability company, an unincorporated organization or a governmental entity or any department, agency or political subdivision thereof.

"Prohibited Person" means any Person identified on the OFAC List or any other Person with whom a U.S. Person may not conduct business or transactions by prohibition of Federal law or Executive Order of the President of the United States of America.

"Promote Distributions" has the meaning set forth in the operating agreement or other governing document of the applicable Subsidiary.

"Proposed Annual Budget" has the meaning set forth in Section 6.7.

"Recourse Party" shall have the meaning set forth in Section 7.7.1.

"Regulations" means the income tax regulations promulgated under the Code.

"Regulatory Allocations" shall have the meaning set forth in Section 5.2.5.

"Rejected Eligible Asset" shall have the meaning set forth in Section 7.2.2.

"Reserves" means, as the context may require, (a) the amount of any escrows or reserves required to be held and maintained pursuant to a loan to which the Company or any Subsidiary is a party, and/or (b) the amount of any escrows or reserves held by the Company as determined by Managing Member; provided that, unless required under a loan, the Company shall not hold reserves less than $375,000 without Investor Member's consent, not to be unreasonably withheld, conditioned or delayed.

"Responding Member" shall have the meaning set forth in Section 7.9.1.

"ROFO Closing Date" shall have the meaning set forth in Section 7.9.4.

"ROFO Default" shall have the meaning set forth in Section 7.9.4.

"ROFO Deposit" shall have the meaning set forth in Section 7.9.2.

"ROFO Election" shall have the meaning set forth in Section 7.9.2.

"ROFO Price" shall have the meaning set forth in Section 7.9.1.

"ROFO Sale" shall have the meaning set forth in Section 7.9.2.

"Sale Asset" shall have the meaning set forth in Section 7.9.1.

"Subsidiary" shall mean any Person of which fifty percent (50%) or more is owned, directly or indirectly, by the Company or which is Controlled by the Company.

"Tax Matters Partner" shall have the meaning set forth in Section 5.5.1.

"Taxing Authority" shall have the meaning set forth in Section 5.4.

"Transfer" means, with respect to a Membership Interest, a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of all or any portion of such Membership Interest, directly or indirectly, including a sale, exchange, transfer, conveyance, assignment, pledge, hypothecation, encumbrance, abandonment or other disposition of, or issuance of an additional equity interest in, all or any portion of the equity of (A) the Member that owns such Membership Interest or (B) any direct or indirect beneficial owner of such Member.

"Unreturned Capital Contributions" means with respect to each Member, as of any date, the aggregate Capital Contributions by the Member on or before such date as reduced (but not below zero) by the amount of distributions received by such Member pursuant to Section 6.2(ii).

## ARTICLE II

## ESTABLISHMENT OF THE COMPANY

2.1. Formation of the Company. The Members hereby form the Company as a limited liability company under and pursuant to the provisions of the New York Limited Liability Company Law, as amended (the "Act") and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided in this Agreement. Upon the execution of this Agreement, the Members shall be members of the Company. The execution and filing of the Certificate of Formation with the Department of State of the State of New York is hereby ratified and confirmed in all respects.

2.2. Company Name. The business of the Company shall continue to be conducted under the name of "Arch Real Estate Holdings LLC"; provided, however, that, subject to all applicable laws, the business of the Company may be conducted under any other name or names deemed necessary or advisable by Managing Member, as long as such name does not include or incorporate all or any part of the name of any Members or their respective Affiliates. In this regard, Managing Member shall file, or cause to be filed, all such fictitious name or similar filings as may be appropriate from time to time.

2.3. Purposes. The Members hereby agree that the Company is to be organized for the benefit of each Member, for the following purposes: (i) create a real estate

investment company to invest in real property, (ii) invest in, acquire, own, hold, sell, transfer, hypothecate, provide services to, manage, and ultimately dispose of real estate both directly and indirectly through Subsidiaries; (iii) make, enter into, perform and carry out any arrangements, contracts or agreements relating to the foregoing; and (iv) do any and all things necessary or incidental to any of the foregoing to carry out and further the business of the Company as contemplated by this Agreement.

2.4. Principal Place of Business and Address. The principal place of business of the Company shall be located at such place as Managing Member may from time to time designate. Managing Member shall provide written notice of the Company's principal place of business to Investor Member promptly after a change in the Company's principal place of business. The Company may maintain offices and other facilities from time to time at such other locations as may be deemed necessary or advisable by Managing Member.

2.5. Term. The existence of the Company commenced as of the date of the filing of the Certificate of Formation of the Company with the Department of State of the State of New York and shall continue until terminated or dissolved under the provisions of this Agreement.

2.6. Agent for Service. The agent for service of process upon the Company shall be as set forth in the Certificate of Formation. or such other agent as may be designated from time to time by Managing Member.

2.7. Admission of Members. Investor Member and Managing Member are the only Members of the Company as of the date hereof. Except as expressly permitted by this Agreement, no other Person shall be admitted as a member or manager of the Company and no other Person has the right to take part in the ownership or management of the Company.

2.8. Limitation on Liability. Except as otherwise expressly provided in the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company, solely by reason of being a Member of the Company.

## ARTICLE III

## CAPITAL CONTRIBUTIONS

3.1. Initial Capital Contributions. On the date hereof, each Member shall make an initial Capital Contribution to the Company in the amount of immediately available funds set forth on Schedule 1 hereto opposite its name under the heading "Initial Capital Contribution."

3.2. Additional Capital Contributions.

3.2.1. If, at any time or from time to time, Managing Member determines that additional funds are required by the Company (x) to meet its general and administrative expenses in connection with the Approved Budget exclusive of those related to a Permitted Investment or (y) to satisfy the costs associated with the Company's due diligence in connection

with approved Eligible Assets, Managing Member shall deliver a written notice to Investor Member (a "Capital Call Notice") setting forth the total amount of capital required (the "Capital Call Amount") and the purpose of such Capital Call. Notwithstanding anything herein to the contrary, without the consent of Investor Member, which may be granted or withheld in its sole and absolute discretion, in no event shall the Company be permitted to make a Capital Call if the Capital Call Amount to be made by Investor Member, when added to the then Unreturned Capital Contributions of Investor Member, would cause the aggregate Unreturned Capital Contributions to exceed Investor Member Maximum Capital Contribution.

3.2.2. Investor Member shall be obligated to make an additional Capital Contribution to the Company in immediately available funds within five (5) Business Days of receipt of the Capital Call Notice equal to the Capital Call Amount.

3.2.3. If the Investor Member shall fail to make a required Capital Contribution, as and when due, for any reason, and such failure continues for two (2) Business Days following written notice of such default, then JJ Member shall have the right to contribute the amount of the Investor Member's capital contribution requested by the applicable Capital Call Notice, which contribution shall not be deemed a capital contribution but rather a loan (a "Default Loan") to the Investor Member in an amount equal to the unfunded capital contribution.

3.2.4. Each Default Loan shall be deemed to constitute a loan made by the JJ Member to the Investor Member in accordance with the terms hereof, immediately followed by a capital contribution by the Investor Member to the Company in the amount of such Default Loan. Each Default Loan will be evidenced by a promissory note in form reasonably satisfactory to the JJ Member and shall constitute a debt owed by the Investor Member. Any Default Loan shall bear interest at the rate of eight percent (8%) per annum, compounded annually, but in no event in excess of the highest rate permitted by applicable laws and shall be payable by the Investor Member from any distributions due to Investor Member hereunder. A Default Loan shall be prepayable, in whole or in part, at any time or from time to time without penalty. Any such Default Loans shall be with full recourse to the Investor Member and shall be secured by the Investor Member's Membership Interest including, without limitation, the Investor Member's right to distributions hereunder. In furtherance thereof, upon the making of such Default Loan, the Investor Member hereby pledges, assigns and grants a security interest in its Membership Interest to the JJ Member and agrees to execute such documents and statements as are reasonably requested by the JJ Member to further evidence and secure such security interest; provided, however, that such security interest may be foreclosed upon only in the event that during the period in which a Default Loan is outstanding, distributions are paid to the Investor Member prior to payment in full of all amounts (including interest) owed under the Default Loan. All distributions that would have otherwise gone to the Investor Member absent the existence of a Default Loan shall be applied first to payment of any interest due under any Default Loan and then to the principal of the Default Loan until all amounts due thereunder are paid in full. While any Default Loan is outstanding, the Company shall be obligated to pay directly to the JJ Member, for application to and until all Default Loans (and interest accrued thereon) have been paid in full, the amount of (x) any distributions payable to the Investor Member, and (y) any proceeds of the sale of the Investor Member's Membership Interest. Payments on account of Default Loan shall be made proportionally based on all Default Loans payable by the applicable Investor Member.

3.3. No Interest. Except as agreed between the Members and the Company or as expressly set forth in this Agreement, no interest will be paid by the Company (a) on any Capital Contribution made by such Member, (b) on the balance of any Capital Account of such Member or (c) on any advance to the Company from such Member.

3.4. JJ Member Promote Distribution Capital Contributions. No later than ten (10) Business Days after the receipt of Promote Distribution, if the Unreturned Capital Contribution of Investor Member is in excess of zero, JJ Member shall make a capital contribution to the Company equal to the lesser of (i) the amount of such JJ Member Promote Distribution or (ii) the product of the Investor Member's Unreturned Capital Contribution and a fraction, the numerator of which is the aggregate unreturned capital contributions made by JJ Member and its Affiliates to all Subsidiaries and the denominator of which is the aggregate unreturned capital contributions made by JJ Member, Investor Member and their respective Affiliates to all Subsidiaries.

3.5. Return of Capital. Except as provided in Section 3.2.5, no Member shall have the right to demand or to receive the return of all or any part of its contributions to the capital of the Company. In addition, no Member has the right to demand or to receive property other than cash in return for its contributions to the capital of the Company and, except as provided in this Agreement, no Member shall have any priority over any other Member as to the return of the Capital Contributions of such Member or the balance in such Member's Capital Account.

3.6. No Personal Liability. Except as otherwise expressly provided in this Agreement no Member shall be personally liable for the return of any Capital Contributions of, or loans made by, the Members or any portion thereof and the return of Capital Contributions and repayment of such loans by the Members shall be made solely from the Company's assets. No Member shall be personally liable for the payment or performance of the debts and other obligations of the Company, except as set forth in Section 7.6.1.

## ARTICLE IV

## CAPITAL ACCOUNTS, ALLOCATIONS; DECISIONS

4.1. Capital Accounts. A capital account ("Capital Account") shall be maintained for each Member in accordance with Section 704(b) of the Code and Regulations Sections 1.704-1(b) and 1.704-2. Each Member's Capital Account shall be as set forth in the Company's books and records.

4.2. Adjustments. The Capital Account of each Member shall be increased by (i) the amount of any cash contributed by such Member to the capital of the Company, (ii) the Book Value of any property contributed by such Member to the capital of the Company (net of liabilities that the Company is considered to assume, or take property subject to, under Section 752 of the Code), (iii) such Member's share of Net Profits (as determined in accordance with Section 5.1) and (iv) any income and gain allocated to such Member pursuant to Section 5.2. The Capital Account of each Member shall be decreased by (w) the amount of all cash distributions to such Member, (x) the Book Value of any property distributed to such Member by the Company (net of liabilities that the Member is considered to assume, or take property subject

to, under Section 752 of the Code), (y) such Member's share of Net Losses (as determined in accordance with Section 5.1), and (z) any deductions and losses allocated to such Member pursuant to Section 5.2.

4.3. Negative Capital Accounts. No Member shall be required to return or repay a negative balance in its Capital Account or an obligation to contribute additional capital to the Company to restore a negative Capital Account.

4.4. Transfers. If any Membership Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest.

4.5. Capital Account Balance. Except as otherwise provided in this Agreement, whenever it is necessary to determine the Capital Account balance of any Member, the Capital Account balance of such Member shall be determined after giving effect to all allocations pursuant to Sections 5.1 and 5.2 and all contributions and distributions made prior to the time as of which such determination is to be made.

## ARTICLE V

## ALLOCATIONS AND DISTRIBUTIONS

5.1. Allocations of Net Profit and Net Loss. After the application of Section 5.2, Net Profit and Net Loss for any taxable year, or portion thereof, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, and after taking into account actual distributions made during such taxable year, or portion thereof, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to Section 10.3.3 if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities, including the Company's share of any liability of any entity treated as a partnership for U.S. federal income tax purposes in which the Company is a partner, were satisfied (limited with respect to each nonrecourse liability to the Book Value of the assets securing such liability) and the net assets of the Company were distributed in accordance with Section 10.3 to the Members immediately after making such allocation, minus (ii) such Member's share of Company minimum gain and Member nonrecourse debt minimum gain determined pursuant to Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5), computed immediately prior to the hypothetical sale of assets. Subject to the other provisions of this Article V, an allocation to a Member of a share of Net Profit or Net Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Net Profit or Net Loss.

5.2. Regulatory Allocations.

5.2.1. Notwithstanding any other provision of this Agreement, (i) "partner nonrecourse deductions" (as defined in Regulations Section 1.704 2(i)), if any, of the Company shall be allocated for each period to the Member that bears the economic risk of loss within the meaning of Regulations Section 1.704-2(i) and (ii) "nonrecourse deductions" (as defined in Regulations Section 1.704-2(b)) and "excess nonrecourse liabilities" (as defined in

Regulations Section 1.752-3(a)), if any, of the Company shall be allocated equally among the Members.

5.2.2. This Agreement shall be deemed to include "qualified income offset," "minimum gain chargeback" and "partner nonrecourse debt minimum gain chargeback" provisions within the meaning of the Regulations under Section 704(b) of the Code. Accordingly, notwithstanding any other provision of this Agreement, items of gross income shall be allocated to the Members on a priority basis to the extent and in the manner required by such provisions.

5.2.3. To the extent that Net Loss or items of loss or deduction otherwise allocable to a Member hereunder would cause such Member to have an Adjusted Capital Account Deficit as of the end of the taxable year to which such Net Loss, or items of loss or deduction, relate (after taking into account the allocation of all items of income and gain for such taxable period), such Net Loss, or items of loss or deduction, shall not be allocated to such Member and instead shall be allocated to the Members in accordance with Section 5.1 as if such Member were not a Member.

5.2.4. If any Member has an Adjusted Capital Account Deficit at the end of any taxable year, such Member shall be specially allocated items of income and gain in the amount of such Adjusted Capital Account Deficit as quickly as possible, provided that an allocation pursuant to this Section 5.2.4 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article V have been made as if Section 5.2.3 and this Section 5.2.4 were not in this Agreement.

5.2.5. Any allocations required to be made pursuant to Sections 5.2.1-5.2.4 (the "Regulatory Allocations") (other than allocations, the effects of which are likely to be offset in the future by other special allocations) shall be taken into account, to the extent permitted by the Regulations, in computing subsequent allocations of income, gain, loss or deduction pursuant to Section 5.1 so that the net amount of any items so allocated and all other items allocated to each Member shall, to the extent possible, be equal to the amount that would have been allocated to each Member pursuant to Section 5.1 had such Regulatory Allocations under this Section 5.2 not occurred.

5.2.6. It is intended that prior to a distribution of the proceeds from a liquidation of the Company pursuant to Section 10.3, the positive Capital Account balance of each Member shall be equal to the amount that such Member is entitled to receive pursuant to Section 10.3. Accordingly, notwithstanding anything to the contrary in this Article V, to the extent permissible under Sections 704(b) of the Code and the Regulations thereunder, Net Profit and Net Loss and, if necessary, items of gross income and gross deductions, of the Company for the year of liquidation of the Company (or, if earlier, the year in which all or substantially all of the Company's assets are sold, transferred or disposed of) shall be allocated among the Members so as to bring the positive Capital Account balance of each Member as close as possible to the amount that such Member would receive if the Company were liquidated and all the proceeds were distributed in accordance with Section 10.3.

5.3. Tax Allocations.

5.3.1. For federal income tax purposes, except as otherwise provided in this Section 5.3, each item of income, gain, loss and deduction shall be allocated among the Members in the same manner as its corresponding item of book income, gain, loss or deduction is allocated pursuant to Sections 5.1 and 5.2.

5.3.2. In accordance with Sections 704(b) and 704(c) of the Code and the Regulations thereunder, income, gain, loss and deduction with respect to any Company Asset contributed (or deemed contributed) to the capital of the Company shall, solely for federal income tax purposes, be allocated among the Members so as to take into account any variation between the adjusted basis of such Company Asset for federal income tax purposes and its Book Value upon its contribution (or deemed contribution). If the Book Value of any Company Asset is adjusted, subsequent allocations of taxable income, gain, loss and deduction with respect to such Company Asset shall take account of any variation between the adjusted basis of such Company Asset for federal income tax purposes and the Book Value of such Company Asset in the manner prescribed under Code Sections 704(b) and 704(c) and the Regulations thereunder.

5.3.3. If a Member acquires a Membership Interest, redeems all or a portion of its Membership Interest or transfers a Membership Interest during a taxable year, the Net Profit or Net Loss (and other items referred to in Sections 5.1 and 5.2) attributable to any such Membership Interest for such taxable year shall be allocated between the transferor and the transferee by closing the books of the Company as of the date of the transfer, or by any other method permitted under Section 706 of the Code and the Regulations thereunder that is selected by the Tax Matters Partner.

5.4. Withholding. The Company at all times shall be entitled to make payments with respect to each Member in amounts required to discharge any obligation of the Company to withhold or make payments to any U.S. federal, state, local or foreign taxing authority ("Taxing Authority") with respect to any distribution or allocation of income or gain to such Member and to withhold (or deduct) the same from distributions to such Member. Any funds withheld from a distribution by reason of this Section 5.4 shall nonetheless be deemed distributed to the Member in question for all purposes under this Agreement. If the Company makes any payment to a Taxing Authority in respect of a Member hereunder that is not withheld from actual distributions to the Member, then the Member shall reimburse the Company for the amount of such payment, on demand. The amount of a Member's reimbursement obligation under this Section 5.4, to the extent not paid, shall bear interest at a rate equal to the lesser of (i) the maximum rate of interest allowed by applicable law or (ii) twelve and one-half percent (12.5%) per annum, compounded quarterly, and shall be deducted from the distributions to such Member; any amounts so deducted shall constitute a repayment of such Member's obligation hereunder. Each Member's reimbursement obligation under this Section 5.4 shall continue after such Member transfers its interest in the Company or after a withdrawal by such Member. Each Member agrees to furnish the Company with any representations and forms as shall reasonably be requested by the Company to assist it in determining the extent of, and in fulfilling, any withholding obligations it may have. Each Member agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest or penalties which may be asserted by reason of the failure to deduct and withhold tax on amounts distributable or allocable to such Member. Any amount payable as indemnity hereunder by a

Member will be paid promptly to the Company, and if not so paid, the Company will be entitled to retain any distributions due to such Member for all such amounts.

5.5. Tax Matters.

5.5.1. Tax Matters Partner; Partnership Representative. Managing Member shall be the "Tax Matters Partner" of the Company. The Tax Matters Partner shall be authorized to take any action permitted by the Code, including settling or offering to settle any tax controversy, selecting the Company's choice of litigation forum in a tax controversy or taking any other action in its capacity as Tax Matters Partner. The Tax Matters Partner shall be reimbursed by the Company for any reasonable expenses (including reasonable attorneys' fees and expenses) incurred in its capacity as Tax Matters Partner. Managing Member is hereby designated the "partnership representative" (as such term is defined in Section 6223(a) of the Code) of the Company for any tax period subject to the provisions of Section 6223 of the Code, as amended by the Revised Partnership Audit Procedures, as well as for purposes of any state, local, or non-U.S. tax law. Managing Member shall not cause the Company to elect, under Section 6241(g)(4) of the Code, to have any provision of the Revised Partnership Audit Procedures apply to the Company for any Company taxable year beginning before January 1, 2018. Managing Member, after consultation with the other Member, shall promptly notify the Members upon the receipt of a notice of final partnership adjustment, and shall make such elections as needed or take other actions as it determines in its sole discretion to be in the best interests of the Company, current Members and former Members to comply with the Revised Partnership Audit Procedures. The Members agree to cooperate in good faith, including by timely providing information, making elections and filing amended returns, each as reasonably requested by the partnership representative. The Members agree to file all U.S. federal, state, and local tax returns on a basis consistent with any returns filed by the Company and the terms of this Agreement. The provisions contained in this Section 5.5.1 shall survive the dissolution of the Company, the withdrawal of any Member or the transfer of any Member's interest in the Company.

5.5.2. Tax Elections. All elections and other tax decisions by the Company and its Subsidiaries pertaining to any federal, state or local income tax return, income tax or other tax matter, including extending the statute of limitation and whether to litigate or settle any tax controversy, shall be made by the Tax Matters Partner, in its good faith discretion after consultation with Investor Member; provided, however, that the Members intend that the Company shall be treated as a partnership for federal and, where permissible, state and local, income tax purposes, and neither the Tax Matters Partner, nor any Member, nor the Company, shall take any action inconsistent with such intent. The Company shall claim all deductions and make such elections for federal or state income tax purposes, which the Tax Mattes Partner reasonably believes, will produce the most favorable tax results for the Members. The Tax Matters Partner shall not extend the statute of limitations on behalf of the Company as contemplated in Section 6229(b)(1)(B) of the Code without the unanimous consent of the Members. The Company and the Tax Matters Partner shall provide each Member with a copy of any material Notice it gives to or receives from the Internal Revenue Service promptly after sent or its receipt thereof.

5.5.3. Tax Returns. The Tax Matters Partner shall prepare or cause to be prepared, and shall file or cause to be filed, any tax returns, information returns, applications,

elections and other instruments and documents required under applicable tax law to be filed by the Company and/or any of its Subsidiaries. The Tax Matters Partner shall provide to each Member a Form K-1 with respect to the Company by March 15th of each year.

5.6. Section 754 Election. In the event a distribution of any Company Asset occurs which satisfies the provisions of Section 734 of the Code or in the event a transfer of an Interest occurs which satisfies the provisions of Section 743 of the Code, upon the request of any of the Members, the Company shall elect, pursuant to Section 754 of the Code, to adjust the basis of the Company's property to the extent allowed by such Section 734 or 743 and shall cause such adjustments to be made and maintained. Each Member shall provide the Company with such information and such other cooperation as may be necessary to receive from such Member in order for such election to be made and effected.

## ARTICLE VI

## DISTRIBUTIONS

6.1. Distributions of Cash Flow. Cash Flow, if any, shall be distributed to the Members monthly or more frequently from time to time as determined by Managing Member in the following order of priority:

(i) First, to Investor Member an amount equal to 4% per annum simple interest on its Unreturned Capital Contribution;

(ii) Second, to Investor Member and JJ Member pro rata based on their respective Unreturned Capital Contributions until their respective Unreturned Capital Contributions are reduced to zero;

(iii) Thereafter, 80% to JJ Member and 20% to Investor Member.

6.2. Distributions of Acquisition Fees. All Acquisition Fees, if any, shall be distributed within five (5) Business Days of the receipt thereof to the Members as follows: 20% to Investor Member; and 80% to JJ Member.

6.3. Distributions Restricted by the Act. Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any payment, distribution or redemption to any Member on account of its Membership Interest if such payment, distribution or redemption would violate the Act or any other applicable law.

## ARTICLE VII

## MANAGEMENT AND OPERATIONS

7.1. Management.

7.1.1. The business, affairs and assets of the Company shall be managed, arranged and caused to be coordinated by Managing Member, who shall have, except as otherwise provided in this Agreement (including, but not limited to, in Section 7.1.3), full,

exclusive and complete discretion with respect thereto. Subject to and in accordance with the provisions of this Agreement, Managing Member shall have all necessary and appropriate powers to carry out the purposes of the Company set forth in Section 2.3. Except as otherwise provided in this Agreement, Managing Member shall have the unilateral power and authority acting in good faith to make and implement all decisions with respect to all matters which the Company has the authority to perform both directly and indirectly through one or more Subsidiaries, including, without limitation, the power to:

(i) conduct, manage and control the affairs and business of the Company, and to make such rules and regulations therefor consistent with the Act, with the Certificate of Formation of the Company and this Agreement;

(ii) open, maintain and close bank accounts and draw checks or other orders for the payment of monies;

(iii) enter into any contract or endorsement in the name or for the account of the Company;

(iv) employ, retain, or otherwise secure or enter into contracts, agreements and other undertakings with persons in connection with the management and operation of the Company's business, including, without limitation, any property managers, attorneys and accountants, and including, without limitation, contracts, agreements or other undertakings and transactions with Managing Member or its Affiliate, all on such terms and for such consideration as Managing Member deems advisable; provided, however, that any such contracts, agreements or other undertakings and transactions with Managing Member or its Affiliates shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(v) bring or defend, pay, collect, compromise, arbitrate, resort to legal action, or otherwise adjust claims or demands of or against the Company;

(vi) deposit, withdraw, invest, pay, retain and distribute the Company's funds in a manner consistent with the provisions of this Agreement;

(vii) admit one or more additional members solely to provide necessary capital in the event that Investor Member fails to fund a required Capital Contribution pursuant to Section 3.2;

(viii) cause the Company to carry such indemnification insurance as Managing Member deems necessary to protect it and any other individual or entity entitled to indemnification by the Company; and

(ix) take any of the foregoing actions on behalf of the Company in its capacity as a direct or indirect Controlling entity of a Subsidiary.

7.1.2. Except as otherwise provided in this Agreement, Investor Member shall not participate in the management or control of the Company or have any right to approve,

vote on or otherwise consent to any matter relating to the business, affairs or assets of the Company. Unless authorized in writing to do so by this Agreement or by Managing Member, no Member, attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose.

7.1.3. Notwithstanding anything to the contrary contained in this Agreement, if Managing Member desires to cause the Company or a Subsidiary to take any of the following decisions or actions (each a "Major Decision"), Managing Member shall provide written notice thereof to the Members with such additional information as the non-Managing Member may reasonably request. Any Major Decision shall be undertaken only with the prior written consent of all Members (and, for the avoidance of doubt, any action or decision that would constitute a Major Decision if made or taken by the Company shall be a Major Decision if made or taken by any Subsidiary), which consent shall be deemed granted by a Member if such Member fails to object to such action within fifteen (15) days of Managing Member's written request therefor:

(i) acquire any direct or indirect interests in any real property;

(ii) file, acquiesce to, consent to or take of any Bankruptcy Action;

(iii) sell any Company Asset or any portion thereof other than any Company Asset that is not longer required for the operation of the Company or any other Company Asset or any obsolete personal property or in accordance with Section 7.9;

(iv) merge, consolidate or other reorganize the Company with another Person;

(v) borrow or raise monies, or utilize any other forms of leverage and issue, accept, endorse and execute promissory notes, drafts, lending agreements, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness;

(vi) possess, lend, transfer, mortgage, pledge or otherwise deal in, and secure the payment of obligations of the Company (excluding from Managing Member and its Affiliates) by mortgage upon, or hypothecation or pledge of, all or part of a Company Asset, and to execute such pledge and security agreements in connection with such pledge, or participate in arrangements with creditors, institute and settle or compromise claims, suits and administrative proceedings and other similar matters;

(vii) enter into any lease for space at a Company Asset of more than 10% of the rentable area of such Company Asset;

(viii) engage in any business or activity not authorized by this Agreement;

(ix) enter into any agreement requiring the expenditure of more than $50,000 per annum;

(x) enter into any agreement with Managing Member and/or any Affiliate thereof, on the one hand, and the Company on the other hand; except as provided in Section 7.3 and for transactions where the compensation paid to Managing Member or any such Affiliate shall be at market rates charged by comparable unaffiliated service providers of at least equal qualification and experience in arms-length transactions;

(xi) incur any expense in excess of the amount set forth in the Annual Budget; provided that emergency expenditures and other expenditures not in excess of 10% over any line item in, or 5% over the aggregate, Annual Budget amount may be incurred without the consent of Investor Member;

(xii) enter into any amendment or modification to this Agreement except as otherwise expressly permitted in this Agreement;

(xiii) admit new or substitute Members to the Company or any Subsidiary;

(xiv) modify any material terms of any organizational document of any Subsidiary; and

(xv) cause any Subsidiary to take any of the foregoing.

7.1.4. Removal of JJ Member as Managing Member. JJ Member cannot be removed as "managing member" except by the Investor Member upon a Cause Event. Investor Member may remove JJ Member as "managing member" upon a Cause Event effective ten (10) Business Days after the delivery of written notice thereof to JJ Member, or at such later date as is specified in such notice. Upon JJ Member's receipt of a Notice of Removal, JJ Member shall reasonably cooperate with Investor Member in complying with any requirements imposed by any lender to the Company or a Subsidiary with respect to the replacement of JJ Member as the Managing Member. If JJ Member is removed as "managing member" then (i) JJ Member shall have all voting and consent rights provided to Investor Member in this Agreement as if JJ Member were "Investor Member" and (ii) if such removal is a result of a Cause Event under clauses (i) – (v) of the definition of Cause Event, JJ Member shall have no right to receive any distributions pursuant to Section 6.1(iii) or 6.2.

7.1.5. Meetings. Managing Member shall meet with Investor Member, which meeting may be by telephone, no less frequently than monthly to provide Investor Member with a general update on the Company Asset and the Company. Any action required or permitted to be taken at any meeting or otherwise requiring the affirmation, vote, consent or approval of the Members may be taken without a meeting if the Members affirm, vote for, consent to or approve, the same at a meeting do so in writing, and the writing or writings are filed with the minutes of proceeding of the Members, as the case may be.

7.2. Services of the Members; Company Opportunities.

7.2.1. Managing Member and Investor Member shall devote such time and effort to the business of the Company as shall reasonably be necessary to promote adequately the interests of the Company and the mutual interests of the Members; provided, however, it is specifically understood and agreed that no Member nor their respective Affiliates shall be required to devote full time to the business of the Company and that, except as otherwise provided in this Section 7.2 or in such other agreements in effect from time to time among the two or more of the parties hereto, the Members and their respective Affiliates may at any time and from time to time (i) engage in and possess interests in other business ventures of any and every type and description, and (ii) subject to Section 7.2.2 or Section 7.9, acquire real estate related assets, and, in any such case, neither the Company nor the Members shall by virtue of this Agreement or otherwise have any right, title or interest in or to such independent ventures, debt instruments or equity interests.

7.2.2. Prior to the Investment Expiration Date or, if an Expense Contribution is required at such time as the Investor Member Maximum Expense Capital Contribution has been funded and Investor Member elects not to make such Expense Contribution, Managing Member and its Affiliates shall first offer all Eligible Assets to the Company. Managing Member shall provide Investor Member with such information with respect to such Eligible Asset as is reasonably required for Investor Member to make an informed decision as to whether to consent to the Company acquiring such Eligible Asset including, without limitation, a description of the Eligible Asset, historic financial statements, if any, with respect to such Eligible Asset, projected cash flows from such Eligible Asset, the estimated costs associated with acquiring such Eligible Asset, including due diligence costs, and the amount, if any of the capital that will be contributed by Managing Member, together with such other information as Investor Member shall reasonably request (the "Due Diligence Information"). If Investor Member fails to consent to the Company acquiring any proposed Eligible Asset within fifteen (15) days of Managing Member providing the Due Diligence Information and Managing Member has elected to provide not less than 5% of the equity capital (after taking into account reasonably anticipated debt or third party equity financing) required to acquire such Eligible Asset (a "Rejected Eligible Asset"), Managing Member shall have the right to pursue such Eligible Asset independent of the Company provided however if the ultimate terms of the investment in such Eligible Asset are, in the aggregate, no more favorable to Managing Member than those presented to the Company. Notwithstanding the foregoing, prior to the Investment Expiration Date, Managing Member shall not acquire any Rejected Eligible Asset which is in the same asset class and within a radius of 0.25 miles for urban properties and 2.0 miles for non-urban properties as an existing Company Asset.

7.3. Guaranteed Payment; Fees and Expenses.

7.3.1. Guaranteed Payment. As compensation for its various undertaking and capital commitments hereunder, Managing Member shall be entitled to a monthly guaranteed payment from the Company equal to the amount set forth in the Annual Budget as "Managing Member Guaranteed Payment" which shall be payable by the Company in advance. The right of Managing Member to receive Managing Member Guaranteed Payment shall automatically terminate upon Managing Member no longer serving as the "Managing Member" of the Company.

7.3.2. Acquisition Fee. In connection with the acquisition of each Eligible Asset, the Company shall be entitled an acquisition fee in an amount to be agreed upon by the Members.

7.3.3. Development Fee/Asset Management Fee/Other Fees. To the extent that an Eligible Asset is acquired in a Subsidiary with non-Affiliated investors, Managing Member shall use its good faith efforts to provide for the Company to be entitled to receive property management, financing, disposition, development and other customary fees paid with respect to assets of the nature of such Company Asset to the extent the Company or an Affiliate of the Company or a Member provides such services.

7.3.4. Due Diligence Expenses. The Company shall reimburse each Member for any actual out-of-pocket third party expenses incurred by such Member in connection with its determination as to whether to cause the Company to acquire an Eligible Asset.

7.4. Budget. The initial Annual Budget of the Company is as set forth in Exhibit B hereto. No later than November 1 of each calendar year, Managing Member shall prepare (or cause to be prepared) an annual budget (the "Proposed Annual Budget"), and deliver such Proposed Annual Budget to Investor Member. In the event that Investor Member objects in writing to all or a portion of the Proposed Annual Budget within thirty (30) days of receipt thereof, the Members shall, diligently and in good faith, attempt to achieve a unanimous decision with respect to the Proposed Annual Budget. In the event that Members are unable to achieve a unanimous decision with respect to the Proposed Annual Budget, the Annual Budget then in effect shall remain the Annual Budget modified as follows: (i) any line item agreed upon by the Members in the Proposed Annual Budget shall be substituted for the same line item in the current Annual Budget; (ii) all line items that are not agreed upon shall be the lesser of the amount provided for in the current Annual Budget or the amount set forth in the Proposed Annual Budget; and (iii) any new line item in the Proposed Annual Budget shall not be deemed included in the Annual Budget.

7.5. Legal Title to Company Asset. Legal title to property of the Company, shall be held in the name of the Company or a Subsidiary.

7.6. Guaranties.

7.6.1. The Members acknowledge that in connection with any (i) financing or refinancing by the Company or any Subsidiary entered into on or after the date of this Agreement with respect to a Company Asset the lender may require any customary guaranty of payment, nonrecourse carve-out guaranty, construction completion guaranty, environmental indemnification and/or guaranty of compliance with applicable laws or (ii) lease for office space the landlord requires a guaranty of the Company's obligations thereunder (each, a "Guaranty," and collectively, "Guaranties"). Each Member, in its sole discretion, shall or shall cause one or more of its Affiliates satisfactory to the applicable lender or landlord (each a "Recourse Party") to provide any such Guaranty.

7.6.2. In consideration of providing an unconditional payment Guaranty, the party providing such Guaranty shall be entitled to a one-time fee equal to 2.0% of the amount

so guaranteed, which fee shall be payable by the applicable Subsidiary at the closing of the applicable loan. In the event that more than one Person provides an unconditional guaranty, such guaranty fee shall be allocated equally among the Recourse Parties or as otherwise agreed by the Recourse Parties.

7.6.3. Notwithstanding anything herein contained to the contrary, neither Member or any of its respective Affiliates shall be required to execute, deliver or issue any Guaranty in connection with any financing or refinancing, or office lease, by the Company or any Subsidiary except, with respect to Managing Member, in the case of a financing or refinancing, for customary "bad boy non-recourse carveout" Guaranties where Managing Member has control over the events giving rise to the payment on any guaranteed obligations.

7.6.4. Each Member agrees if a lender makes any written demand from time to time on a Recourse Party as a result of breach of a "bad boy non-recourse carveout" Guaranty, for payment or performance under a Guaranty, each Member shall pay, or reimburse the applicable Recourse Party, for its proportionate share of any amounts required to be paid on account of such Guaranty unless, the breach of the "bad boy non-recourse carveout" Guaranty is directly attributable to any action of JJ Member or its Affiliate, on the one hand, or Investor Member or its Affiliate, on the other hand, and which action was not unanimously approved by JJ Member and Investor Member, in which event the Member who, or whose Affiliate, took such action shall be solely responsible for the amounts due on such Guaranty. Each Member (the "Guarantor Indemnitor") agrees to indemnify, defend and hold harmless the other Member and its Affiliates and their respective directors, officers, employees and agents (collectively, "Guaranty Indemnified Parties") from and against any and all damages, liabilities, losses, costs and expenses, including, without limitation, reasonable attorneys' fees (collectively, "Damages"), actually incurred or suffered with respect to any amounts payable on account of a "bad boy non-recourse carveout" Guaranty by any of the Guaranteed Indemnified Parties to the extent that such Damages are directly attributable to any action by such Guarantor Indemnitor or any of its Affiliates or affirmatively permitted by such Guarantor Indemnitor or any of its Affiliates and which action was not unanimously approved by the Members.

7.7. Other Activities of Members. Except as set forth in Section 7.2, neither this Agreement nor any activity undertaken on behalf of the Company shall prevent any of the Members or any of the Affiliates of the Members, or any Person owning any direct or indirect interest in a Member, individually or jointly with others, from engaging in any other activities or businesses or from making investments, whether or not those activities, businesses or investments are similar in nature to, or may be competitive with, the business of the Company. Neither the Members nor their Affiliates shall have any obligation to account to the Company or to one another for any profits or other benefits derived from other activities, businesses or investments. The Members and their respective Affiliates shall not be obligated to present to the Company or each other any particular investment opportunity, regardless of whether such opportunity is of such character that the Company or any of them could take it if such opportunity were presented to the Company or any of them, and the Members or their Affiliates shall have the right to take for their own accounts, or to recommend to others, any such investment opportunity.

7.8. Acquisition of Eligible Assets. The Members agree that in connection with the acquisition of each Eligible Asset Managing Member shall use commercially reasonable

efforts to (i) cause the Eligible Asset to be acquired through an ownership structure as set forth on Exhibit C and (ii) will, and cause its Affiliated entities depicted on Exhibit C hereto to, form a limited liability company to serve as the direct or indirect managing member or general partner of the acquiring entity and shall, and cause its Affiliated entities depicted on Exhibit C hereto to, enter an operating agreement in substantially the form attached hereto as Exhibit D. The Managing Member shall, to the extent requested by Investor Member, seek to obtain third party equity capital for each such Eligible Asset on such terms as may be reasonably acceptable to the Members. Managing Member shall have the right to allocate a portion of the "promoted" interest to one or more of its employees or affiliates (the "Non-Company Promote Interest").

7.9. Sale of Company Asset.

7.9.1. In the event that either Managing Member or Investor Member desires to cause a Subsidiary to sell its asset and the other Member does not consent to such sale, the Member who desires to sell an asset ("Initiating Member") shall first give to the other Member ("Responding Member") a notice (an "Offer Notice") setting forth the applicable asset that Initiating Member desires to sell (the "Sale Asset") and the minimum gross purchase price at which Initiating Member would be willing to cause the applicable Subsidiary to sell the Sale Asset (the "ROFO Price") and the allocation of all costs (transfer taxes, title, survey etc.) and with respect thereto.

7.9.2. Within thirty (30) days of receipt of an Offer Notice (the "Exercise Period"), Responding Member shall have the right to elect (which election shall be irrevocable) to purchase the Sale Asset from the applicable Subsidiary for the ROFO Price, subject to prorations and adjustments, and otherwise on the same terms and conditions set forth in the Offer Notice (the "ROFO Sale"), by giving written notice of such election within the Exercise Period (the "ROFO Election") and simultaneously depositing with a mutually agreeable escrow agent a non-refundable cash deposit equal to five percent (5%) of the ROFO Price (the "ROFO Deposit") (to be applied to the ROFO Price at closing). At the closing of a ROFO Sale all items of the Sale Asset which are customarily apportioned in the sale of assets comparable to the Sale Asset shall be apportioned between Responding Member and the applicable Subsidiary as of 11:59 PM on the day preceding the closing date in accordance with the customs and practices usual in transactions involving properties comparable to the Sale Asset.

7.9.3. If Responding Member does not timely make a ROFO Election or affirmatively waives its right of first offer, Responding Member shall be deemed to have elected not to purchase the Sale Asset pursuant to this Section 7.9 and Initiating Member shall be free to cause the applicable Subsidiary to proceed to initiate and consummate the sale of the Sale Asset at a price not less than one hundred percent (100%) of the ROFO Price and on such other terms as are no less favorable to the applicable Subsidiary than those provided for in the Offer Notice. If the sale of the Sale Asset is not consummated within one hundred eighty (180) days after the expiration of the Exercise Period, then any attempt to consummate the sale of the Sale Asset thereafter shall again be subject to the provisions of Section 7.1.3(iii) and, if applicable, this Section 7.9.

7.9.4. If Responding Member has timely and properly delivered a ROFO Election, Managing Member and Investor Member shall cause the applicable Subsidiary to consummate the ROFO Sale on an "as is" and "where is" basis within sixty (60) days after the

date of the ROFO Election (the "ROFO Closing Date"). On the ROFO Closing Date, the ROFO Deposit shall be credited against the ROFO Price, and Responding Member shall pay the balance of the ROFO Price (as adjusted) to the applicable Subsidiary, as applicable. If Responding Member has timely and properly delivered a ROFO Election, but thereafter the sale contemplated thereby fails to close within a sixty (60) day period for any reason other than the default of the applicable Subsidiary (a "ROFO Default"), then Responding Member shall be in material default under this Section 7.9 and the escrow agent shall release the ROFO Deposit to the applicable Subsidiary who shall have the right to retain the ROFO Deposit as liquidated damages, it being agreed that in such instance the actual damages would be difficult, if not impossible, to ascertain, and Investor Member shall forfeit its ROFO Deposit and shall have no further rights under this Section 7.9 with respect to the Sale Asset, including the right to give a ROFO Election or to receive Offer Notices. If a ROFO Default occurred, then thereafter, Initiating Member shall have the right to cause the sale of the Sale Asset on any terms and conditions determined by Initiating Member without any further obligation under this Section 7.9.

7.9.5. At the closing of a ROFO Sale, Initiating Member shall cause the applicable Subsidiary to deliver to Responding Member a deed, assignment or other transfer document commonly used in conveying ownership of assets in the form of the Sale Asset, conveying the Sale Asset to Responding Member, which Sale Asset shall be free and clear of all legal and equitable claims and all liens and encumbrances. Initiating Member and Responding Member shall execute, or cause the Company or the applicable Subsidiary to execute, an agreement acceptable to Initiating Member and Responding Member in the exercise of their reasonable judgment in such form and substance which is customary for purchase agreements with respect to assets in the form of the Sale Asset. Prior to consummating a ROFO Sale, Responding Member shall cause all guarantees of Initiating Member (and any Affiliates, members or principals of Initiating Member) under any loan relating to the Sale Asset to which the Company, a Subsidiary or Initiating Member are an obligor to be released with respect to acts occurring after the ROFO Closing Date.

## ARTICLE VIII

## TRANSFER OF MEMBERSHIP INTERESTS;

8.1. Restrictions on Transfers of Membership Interests. No Member shall Transfer all or any portion of its Membership Interest, and each Member shall cause its direct or indirect beneficial owners not to make such a Transfer (nor shall such Member suffer to exist any such Transfer), unless such Transfer is permitted under this Article VIII and until all requirements and conditions stated in this Article VIII, which shall be read and construed as a whole, have been satisfied in full or have been waived by the non-transferring Member. To the fullest extent permitted under applicable law, any Transfer in violation of this Article VIII shall be invalid, ineffective and not enforceable for any purpose, shall be *void ab initio* as to the Transfer of a Membership Interest that would cause such violation, and the intended transferee shall acquire no rights in such Membership Interest. No authorization, consent or waiver applicable to one Transfer shall apply or be deemed to apply to any other Transfer or requested Transfer.

8.2. Permitted Transfers. Notwithstanding Section 8.1, but subject to the applicable provisions of terms of any loan to any Subsidiary or the Company, a Member may Transfer, directly or indirectly, all or a portion of such Member's Interest, without the consent of the Company or any other Member, as follows ("Permitted Transfers"):

(i) Transfers of a Member's Interest to another Member;

(ii) Transfers of direct or indirect interests held by an individual in a Member upon the death of such individual;

(iii) Transfers of up to a 49% Membership Interest of a Member as of the date hereof to, or for the benefit of, a Direct Lineal Descendant of the Transferring Member by inter-vivos gift, testamentary disposition or intestate succession, whether outright or in trust; provided, that in the event such Transfer is made in trust then at least one trustee of such trust shall be such Transferring Member or a Direct Lineal Descendent of such Transferring Member making the Transfer, and such trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a Direct Lineal Descendant of the Transferring Member. If such a Direct Lineal Descendent is below the age of twenty-one (21) years or a person who has been adjudged to be insane or incompetent, such Transfer shall only be a Permitted Transfer if such person's right, title and interest in and to the transferred Membership Interests are held in a trust by a trustee for the benefit of such transferee reasonably acceptable to the Board (in its sole discretion), which trustee shall have the sole and exclusive voting, investment and management powers with respect to any Interests of the Company that make up all or any part of the corpus of such trust and the trust agreement for such trust provides that no Interest of the Company which are held in trust may be distributed to a Person other than a Direct Lineal Descendant of the Transferring Member;

(iv) Transfers of up to a 49% Membership Interest of a Member as of the date hereof to a trust for the benefit of a spouse of the Transferring Member; provided, that at least one trustee of such trust shall be a Direct Lineal Descendent of the Transferring Member or a Transferring Member, and such Transferring Member or descendent, as trustee, shall have the sole and exclusive voting, investment and management powers with respect to any Membership Interests of the Company which make up all or part of the corpus of such trust and the trust agreement for such trust provides that no Interests of the Company which are held in such trust may be distributed to a Person other than a spouse or Direct Lineal Descendent of the Transferring Member;

(v) Transfers of up to a 49% Membership Interest of a Member as of the date hereof to any indirect ownership interest in any Member, so long as following such Transfer, except in the event of death or incapacity, (x) in the case of Investor Member, Michael Wiener, William Wiener or Kevin Wiener continues to Control Investor Member or (y) in the case of Managing Member, Jeffrey Simpson or Jared Chassen continues to be in Control of Managing Member.

8.3. Additional Restrictions. Notwithstanding the foregoing, any Transfer by a Member (including, for the avoidance of doubt, any direct or indirect Transfer of any interest in such Member) shall not be permitted, and if purported to be effected, shall be null and void *ab initio* if:

(i) it would violate any financing documents to which the Company or a Subsidiary is bound;

(ii) it would result in the Company or any Member having to register under the Securities Exchange Act of 1934, as amended, the Investment Company Act of 1940, as amended, or any other federal, state or local securities laws;

(iii) it would violate any applicable federal, state or local laws, including the Securities Act of 1933, as amended, and any other securities laws;

(iv) the transferee is a Prohibited Person;

(v) as a result of such Transfer the aggregate value of Membership Interests held by "benefit plan investors" (within the meaning of Section 3(42) of ERISA), is "significant" (as such terms are defined in U.S. Department of Labor Regulation 29 C.F.R. 2510.3-101(f)(2)) with the result that the assets of the Company would be deemed to be "plan assets" for purposes of ERISA; or

(vi) in the opinion of counsel to the Company, there is material risk that such Transfer would cause the Company to be treated as a "publicly traded partnership" within the meaning of Code Section 7704 and the regulations promulgated thereunder.

8.4. Substitute Members. No assignee of all or part of a Member's Interest shall become a substitute Member in place of the assignor Member unless and until:

(a) The Transfer complies with the provisions of this Article VIII;

(b) The assignee has executed an instrument accepting and adopting the terms and provisions of this Agreement as a Member, and agrees in writing that the assigned rights remain subject to all of the terms and conditions of this Agreement and may not be further Transferred except in compliance with this Agreement; and

(c) The assignor or assignee has paid all reasonable expenses of the Company in connection with the admission of the assignee as a substitute Member.

Upon satisfaction of all of the foregoing conditions with respect to a particular assignee, the Company shall cause this Agreement to be duly amended to reflect the admission of the assignee as a substitute Member.

8.5. Effect of Admission as a Substitute Member. Unless and until admitted as a substitute Member pursuant to Section 8.4, a permitted assignee of all or a part of a Member's Interest shall not be entitled to exercise any of the rights or powers of a Member in the Company (all of which shall remain with the assignor Member), including, without limitation, the right to

vote, grant approvals or give consents with respect to such Interest, the right to require any information or accounting of the Company's business or the right to inspect the Company's books and records. Such permitted assignee shall only be entitled to receive, to the extent of the Interest transferred to such permitted assignee, the distributions to which the assignor would be entitled. A permitted assignee who has become a substitute Member has, to the extent of the Interest transferred to such permitted assignee, all the rights and powers of the Person for whom he is substituted as the Member and is subject to the restrictions and liabilities of a Member under this Agreement and the Act. Upon admission of a permitted assignee as a substitute Member, the assignor of the Interest so acquired by the Substitute Member shall cease to be a Member of the Company to the extent of such Membership Interest. A Person shall not cease to be a Member upon assignment of all of such Member's Interest unless and until the assignee(s) becomes a substitute Member.

8.6. Withdrawal, Retirement or Resignation of a Member. No Member shall have the right or power, and no Member shall attempt, to withdraw, resign or retire from the Company prior to the specific date set forth in the Certificate of Formation for the expiration of the term of the Company (if any) or as otherwise specifically set forth in this Agreement. Any act or purported act of a Member in violation of this Section 8.6 shall be null and void and of no effect. If a Member exercises any non-waivable statutory right to withdraw from the Company, such withdrawal shall be a default or breach by the Member of its obligations under this Agreement and the Company may recover from such Member any damages incurred by the Company as a result of such withdrawal and offset the damages against any amounts payable to such Member under the Act, the Certificate of Formation or this Agreement.

## ARTICLE IX

## REPRESENTATIONS; ADDITIONAL AGREEMENT

9.1. Representations. Each Member hereby makes each of the representations, warranties and agreements set forth below, as applicable, and solely with respect to such Member as of the date hereof:

9.1.1. it is a corporation, limited partnership or limited liability company, as applicable, duly organized or formed and validly existing and in good standing under the laws of the state of its organization or formation; it has all requisite limited liability company power and authority to enter into this Agreement, to acquire and hold its Membership Interest and to perform its obligations hereunder; its execution, delivery and performance of this Agreement has been duly authorized by all necessary corporate, limited liability company or partnership action; and it has obtained any consent, approval, authorization or order of any governmental authority or other Person required for its execution, delivery and performance of this Agreement;

9.1.2. its execution and delivery of this Agreement and the performance of its obligations hereunder will not conflict with, result in a breach of or constitute a default (or an event that, with notice or lapse of time, or both, would constitute a default) or result in the acceleration of any material obligation under any of the terms, conditions or provisions of any other agreement or instrument to which it is a party or by which it is bound or to which any of its property or assets is subject, conflict with or violate any of the provisions of its organizational documents, or violate any statute or any order, rule or regulation of any court or governmental

authority, in each case in a manner that results in a prohibition against, or reasonably could be expected to materially and adversely affect, the performance of its duties hereunder;

9.1.3. there is no action, suit or proceeding pending against such Member or, to its knowledge, threatened in any court or by or before any other governmental authority that prohibits or could be reasonably expected to interfere in any material respect with its entering into or performing its obligations under this Agreement;

9.1.4. this Agreement and all agreements, instruments and documents herein provided to be executed by it are and will be binding on and enforceable against such Member in accordance with the terms hereof and thereof; and

9.1.5. (i) neither such Member nor any Person owning an interest in such Member (A) is currently identified on the OFAC List, or (B) is a Person with whom a citizen of the United States is prohibited to engage in transactions by any trade embargo, economic sanction or other prohibition of United States law or regulation or executive order of the President of the United States, and (ii) if required, such Member has implemented procedures, and will consistently apply those procedures, to ensure the foregoing representation and warranty in clause (i) to remain true and correct at all times.

9.2. Indemnity.

9.2.1. Each Member agrees to indemnify and hold harmless the Company, the other Members and their respective Affiliates, officers, directors, shareholders, partners, members, employees, successors and assigns from and against any and all loss, damage, liability or expense (including costs and reasonable attorney's fees) which they may incur by reason of, or in connection with, any material breach of the foregoing representations and warranties, and all such representations and warranties shall survive the execution and delivery of this Agreement and the termination and dissolution of any Member and/or the Company. Any and all amounts paid to the Company pursuant to this Section 9.2 shall not be treated as Capital Contributions to the Company for purposes of this Agreement. If any amounts are owed by a Member under this Section 9.2, the other Member may cause the Company to repay such amounts from distributions that but for this sentence would have been paid to the breaching Member (and any such payments shall be deemed a distribution to the breaching Member).

9.2.2. JJ Member agrees to indemnify and hold harmless the Company, Investor Member and their respective Affiliates, officers, directors, shareholders, partners, members, employees, successors and assigns from and against all out of pocket expenses, losses, liabilities (including liabilities for penalties), judgments, demands or costs (including, without limitation, attorneys' fees) arising from or related to JJ Member or its principals employment with Greystone Development.

9.3. Agreement as to Distributions. JJ Member and Investor Member agree that the calculation set forth on Exhibit F accurately sets forth the allocation of the various forms of distributable revenue that may be received by the Company and a Subsidiary based on the assumptions set forth therein.

## ARTICLE X

## DISSOLUTION AND LIQUIDATION

10.1. Dissolution. This Agreement will terminate and the Company will be dissolved upon the occurrence of any of the following events (each, a "Dissolution Event"):

10.1.1. Upon the unanimous election to dissolve by the Members; or

10.1.2. Upon the disposition of all or substantially all of the Company's assets, and the discontinuance of its business activities, other than activities in the nature of winding up.

Upon the occurrence of a Dissolution Event, the business of the Company shall be wound up as provided in this Article X unless the Members otherwise unanimously agree.

10.2. Statement of Intent to Dissolve. In accordance with the Act, as soon as possible following the occurrence and continuance of a Dissolution Event, the Liquidating Agent will cause to be executed and filed a statement of intent to dissolve the Company in such form as is prescribed by the State of New York.

10.3. Procedures.

10.3.1. Liquidation of Assets. In the event of the dissolution of the Company, Managing Member or the Person required by law to wind up the Company's affairs (such Member or other person being referred to herein as the "Liquidating Agent") will commence to wind up the affairs of the Company and liquidate its assets as promptly as is consistent with obtaining the fair value thereof. In connection with any such winding up and liquidation, a financial statement of the Company as of the date of dissolution will be prepared and furnished to all the Members by the Liquidating Agent.

10.3.2. Authority of Liquidating Agent. In connection with the winding up and dissolution of the Company, the Liquidating Agent will have all of the rights and powers with respect to the assets and liabilities of the Company that an authorized Member or a manager would have pursuant to the Act or any other applicable law.

10.3.3. Distribution of Assets. Following the payment of, or provision for, all debts and liabilities of the Company and all expenses of liquidation, and subject to the right of the Liquidating Agent to set up such cash reserves as the Liquidating Agent may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, the proceeds of the liquidation and any other funds (or other remaining Company assets) of the Company will be distributed in cash to the Members in accordance with the provisions of Section 6.2.

10.4. Termination of the Company. Upon the completion of the liquidation of the Company and the distribution of all assets of the Company and other funds, the Company and this Agreement will terminate and the Liquidating Agent will have the authority to take or cause to be taken such actions as are necessary or reasonable in order to obtain a certificate of

dissolution of the Company as well as any and all other documents required by the Act or any other applicable law to effectuate the dissolution and termination of the Company.

## ARTICLE XI

## FISCAL AND ADMINISTRATIVE MATTERS

11.1. Fiscal Year. The fiscal year of the Company will be the calendar year.

11.2. Checks, Drafts, Etc. All checks, drafts or other orders for the payment of money, and all notes or other evidences of indebtedness issued in the name of the Company will be signed by such Person or Persons and in such manner as Managing Member from time to time shall authorize and designate in writing.

11.3. Books and Records. Managing Member, on behalf of the Company, will maintain books and records relating to the assets and income of the Company and the payment of expenses of, and liabilities or claims against or assumed by, the Company in such detail and for such period of time as may be necessary to enable it to make full and proper accounting in respect thereof and to comply with applicable provisions of law. The Company's books and records will be kept at the principal place of business of Managing Member.

11.4. Right of Inspection. Any Member of the Company will have the right to examine, during normal business hours of Managing Member, for any purpose and upon reasonable prior notice to Managing Member, the minutes and the books and records of account of the Company, and to make copies thereof at such Member's expense. Such inspection may be made by any representative, agent or duly appointed attorney of the Member making such request.

11.5. Reports.

11.5.1. Within time periods set forth on Exhibit E hereto, the Company shall cause to be prepared and sent to each Person who was a Member at any time during such applicable time period, such reports as listed on Exhibit E which shall be prepared in accordance with Generally Accepted Accounting Principles consistently applied.

11.5.2. The Managing Manager shall deliver or cause to be delivered to the Members promptly upon receipt a copy of all notices received by Managing Member, the Company or any Subsidiary from any lender or servicer with respect to the debt financing of the Company or any Subsidiary. In addition, Managing Member shall provide all information reasonably requested in writing by any Member related to the business, operation, and financial performance and condition of the Company or the Property.

## ARTICLE XII

## CONFIDENTIALITY AND PRESS RELEASES

12.1. Confidentiality. The existence of and the terms and conditions of this Agreement, including the identities of all parties referred to in this Agreement, shall be held by

the parties in strict confidence and shall not be disclosed to anyone, other than (a) legal counsel, agents and representatives who need to know such information in connection with the transactions contemplated herein, (b) disclosures required by applicable law, (c) disclosures made in connection with an arbitration, court proceeding or any other dispute resolution mechanism, (d) disclosures of information that is public, non-confidential or non-proprietary in nature, (e) disclosures made to government agencies in connection with the development of the Property), (f) disclosures made in connection with the establishment and existence of any condominium at the property, and (g) disclosures otherwise approved by the parties.

12.2. Press Releases. No Member shall issue or publish any press release, tombstone or other public communication about the formation or existence of the Company or any Subsidiary or the Property without the approval of Managing Member, except to the extent required by law; provided, however, in no event shall any press release, tombstone or other public communication include the name of Investor Member or its Affiliates without the prior written consent of Investor Member.

## ARTICLE XIII

## INDEMNIFICATION

13.1. Indemnification.

13.1.1. No Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) ("Indemnifying Member") shall have any liability to the Company or to any other Member for any loss suffered by the Company or any other Member unless such loss arises out of the willful misconduct or fraud of such Indemnifying Member; provided, however, that this Section 13.1.1 shall not limit, restrict or otherwise affect the rights or obligations of a Member (or any predecessor, successor or Affiliate of such Member or any member, principal, partner, shareholder, controlling person, officer, director, agent or employee of any of the aforesaid Persons) under this Agreement or any other agreement to which it is a party.

13.1.2. The Company shall indemnify, defend and hold harmless each Member and/or its Affiliates, and any of their respective officers, directors, shareholders, partners, members, managers, employees or agents and each officer of the Company (each, an "Indemnitee") from and against any and all claims or liabilities of any nature whatsoever arising out of the business of the Company, including reasonable attorneys' fees and disbursements arising out of or in connection with any action (excluding any Transfer by a Member of all or any portion of its Membership Interest or by any other Person of any direct or indirect beneficial ownership interest in any Member) taken or omitted by it pursuant to the authority granted by this Agreement; provided, however, that no indemnification may be made to or on behalf of any Indemnitee if such Indemnitee's (or its Affiliate's) acts in connection with such claim for indemnification constituted fraud or willful misconduct; and provided, further, that no indemnification shall be made in respect of claims or liabilities to the extent an Indemnitee has already recovered pursuant to any other agreement to which such an Indemnitee is a party. Expenses (including reasonable attorneys' fees and disbursements) incurred by an Indemnitee in defending any actual or threatened claim, demand, action, suit or proceeding shall, from time to

time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Indemnitee to repay such amounts if it is ultimately determined that such Indemnitee is not entitled to indemnification under this Section 13.1.2 with respect thereto. Notwithstanding the foregoing, the Indemnitee shall not be entitled to indemnification with respect to any amount paid in settlement if the settlement was effected without the Company's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

13.1.3. Except as expressly provided herein, no direct or indirect Member, shareholder or member in or of any Member (and no officer, director, member, employee or agent of such Member, shareholder, or member) and no officer of the Company shall have any personal liability under this Agreement.

13.2. Exculpation/Member Indemnification. Except in the case of fraud, gross negligence, or willful misconduct, or as otherwise provided herein, no Member shall be liable to any other Member or the Company for (i) any act or omission performed or omitted in good faith, (ii) such Member's failure or refusal to perform any act, except those required by the terms of this Agreement or (iii) the negligence, dishonesty or bad faith of any agent, consultant or broker of the Company selected, engaged or retained in good faith.

13.3. Insurance. Managing Member may cause the Company, at the Company's expense, to purchase insurance to insure the Indemnitee against liability hereunder, including, without limitation, for a breach or an alleged breach of their responsibilities hereunder; provided, that the Company shall not incur the costs of that portion of any insurance, other than public liability insurance, which insures any Indemnitee for any liability as to which such person is prohibited from being indemnified under this Article XIII.

## ARTICLE XIV

## MISCELLANEOUS

14.1. Notices.

14.1.1. All notices, requests or other communications required or permitted to be made in accordance with this Agreement shall be in writing and shall be delivered personally, by registered or certified mail, return receipt requested, by overnight courier or by email to the Members at the addresses set forth below:

If to Investor Member:

c/o 35 Oak Holdings
Viscor Inc.
35 Oak Street
Toronto, Ontario M9N 1A1
Attn: Frank van Biesen
e-mail: fvanbiesen@35oak.com

If to Managing Member:

c/o Jeffrey Simpson
1230 Park Avenue
16E
New York, New York 10128
e-mail: jsimpson001@icloud.com

With a copy to:

Meltzer, Lippe, Goldstein & Breitstone, LLP
190 Willis Avenue
Mineola, New York 11501
Attention: David J. Heymann, Esq.
Email: dheymann@meltzerlippe.com

14.1.2. All such notices shall be deemed to have been duly delivered: at the time delivered by hand or refusal of delivery, if personally delivered; three (3) Business Days after being deposited in the mail (postage prepaid), if mailed by certified or registered mail; and on the day delivered or refusal of delivery, if sent by an air or ground courier guaranteeing overnight delivery or by email.

14.1.3. Any Member may change the address at which it is to receive notices under this Agreement by furnishing written notice in accordance with the provisions of this Section 14.1 to the other Member.

14.1.4. Whenever any notice is required to be given by law or this Agreement, a waiver thereof in writing, signed by the Person entitled to such notice, whether before or after the time of the event for which notice is to be given, will be deemed equivalent to such notice.

14.2. Extension Not a Waiver. No delay or omission in the exercise of any power, remedy or right herein provided or otherwise available to any party hereto will impair or affect the right of such party thereafter to exercise the same. Any extension of time or other indulgence granted to any party hereunder will not otherwise alter or affect any power, remedy or right of any other party hereto, or the obligations of the party to whom such extension or indulgence is granted.

14.3. Entire Agreement; Amendments. This Agreement sets forth the entire agreement between the parties relating to the subject matter hereof and all prior agreements relative thereto that are not contained herein or therein are terminated. Amendments, variations, modifications or changes herein may be made effective and binding upon the parties hereto by, and only by, a written agreement duly executed by all the Members, and any alleged amendment, variation, modification or change herein which is not so documented will not be effective as to any party hereto.

14.4. Governing Law. THIS AGREEMENT WILL BE GOVERNED BY, CONSTRUED UNDER AND INTERPRETED IN ACCORDANCE WITH THE INTERNAL

LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO ITS CONFLICTS OF LAWS PRINCIPLES.

14.5. Venue. Any action or other legal proceeding brought under this Agreement will be subject to the exclusive jurisdiction of any court of competent jurisdiction in the Borough of Manhattan in the State of New York or the United States District Court for the Southern District of New York. Each of the Members consents to the jurisdiction of New York for actions or legal proceedings brought by any other Member or the Company and waives any objection which it may have to the laying of the venue of such suit, action or proceeding in any of such courts.

14.6. Headings. Sections, subheadings and other headings used in this Agreement are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement, or any provision hereof.

14.7. Severability. Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction will not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable any such provision in any other jurisdiction. In such event, the parties shall work together in good faith to replace any such prohibited or unenforceable provision with a valid and enforceable provision that, as closely as possible, effectuates the parties' intent.

14.8. Failure to Enforce Provision. The failure of any Member to seek redress for a violation, or to insist upon the strict performance, of any covenant or condition of this Agreement will not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

14.9. Interpretation. All pronouns and variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the individual or other entity may require.

14.10. Assignment. This Agreement may not be assigned by any party hereto without the prior written consent of the other parties, except in connection with a Transfer of all or any portion of a Member's Membership Interest as permitted by this Agreement. This Agreement will be binding upon and inure to the benefit of the parties and their respective successors, executors, administrators, personal representatives and permitted assigns.

14.11. Counterparts. This Agreement may be executed in one or more counterparts, all of which, taken together, shall constitute one and the same agreement. The exchange of copies of this Agreement, any amendments hereto, any signature pages required hereunder or any other documents required or contemplated hereunder by facsimile or Portable Document Format transmission shall constitute effective execution and delivery of same as to the parties thereto and may be used in lieu of the original documents for all purposes. Signatures transmitted by facsimile or Portable Document Format shall be deemed to be original signatures for all purposes.

*[Signature page follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

MEMBERS:

[signature]

608941 NJ INC.

By: [signature]

Name: Michael Wiener

Title: EVP

JJ ARCH LLC

By: ______________________

Jeffrey Simpson

Managing Member

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date and year first above written.

MEMBERS:

608941 NJ INC.

By: ______________________________
Name:
Title:

JJ ARCH LLC

By: ______________________________
Jeffrey Simpson
Managing Member