OLSHAN FROME WOLOSKY LLP
1325 Avenue of the Americas
New York, New York 10019
(212) 451-2300
Jonathan T. Koevary
Ryan A. Partelow
jkoevary@olshanlaw.com
rpartelow@olshanlaw.com

*Counsel for Defendants*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>JEFFREY SOLOMON SIMPSON,<br><br>Debtor. | Chapter 11<br><br>Case No. 26-10359 (LGB) |
| JEFFREY SOLOMON SIMPSON, as Debtor and Debtor in Possession,<br><br>Plaintiff,<br><br>- against -<br><br>ARCH REAL ESTATE HOLDINGS LLC, ARCH ASSET MANAGEMENT LLC, and ARCH PROPERTY MANAGEMENT LLC,<br><br>Defendants. | Adversary No. 26-01097 (LGB)<br><br>**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO THE DEBTOR'S MOTION FOR A <u>PRELIMINARY INJUNCTION</u>** |

Table of Contents

Page

INTRODUCTION ....... 1

FACTUAL BACKGROUND ....... 2

LEGAL STANDARD ....... 5

ARGUMENT ....... 6

I. The Debtor Cannot Demonstrate a Likelihood of a Successful Reorganization ....... 6

A. The Debtor Has Not Met His Burden to Show a Plan Will Be Confirmed ....... 6

B. The Record Instead Supports that Conversion or Dismissal is Likely ....... 9

1. The Debtor's Estate is Suffering Continuing Diminution with No Reasonable Likelihood of Rehabilitation ....... 9

2. The Debtor has Engaged in Gross Mismanagement and Violations of Fiduciary Obligations ....... 10

3. The Debtor Has Demonstrated Bad Faith and an Inability to Follow Court Orders ....... 12

II. There Is No Imminent Irreparable Harm ....... 13

A. The Debtor Cannot Establish Harm to the Bankruptcy Estate ....... 14

1. Entities in Which the Debtor Owns or Claims to Own Equity: YJ Simco and WMTR ....... 15

2. Entities Purportedly Transferred to Yael Simpson: Park ST and Park 4 ....... 17

3. Entities that Were Foreclosed Upon: Park 1 and Park PH ....... 18

4. Becker Glynn ....... 19

5. Yael Simpson ....... 21

B. A Default Does Not Constitute Irreparable Harm ....... 24

III. The Balance of Equities Tips In Favor of Defendants ....... 28

Table of Contents
(continued)

Page

IV. The Public Interest Weighs Against an Injunction ....................................................33

CONCLUSION ....................................................................................................................35

Table of Authorities

Page

CASES

*AIG Europe, S.A. v. Sears Holding Corp. (In re Sears Holding Corp.)*,
659 B.R. 236 (Bankr. S.D.N.Y. 2024) .......... 6

*Atlantic Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*,
398 U.S. 281 (1970) .......... 28

*Beeman v. BGI Creditors' Liquidating Tr. (In re BGI, Inc.)*,
504 B.R. 754 (S.D.N.Y. 2014) .......... 27

*CAE Indus. Ltd. v. KPMG Peat Marwick*,
193 A.D.2d 470 (1st Dep't. 1993) .......... 3

*Casse v. Key Bank Nat'l Ass'n. (In re Casse)*,
198 F.3d 327 (2d Cir. 1999) .......... 33

*Citibank, N.A. v. Citytrust*,
756 F.2d 273 (2d Cir. 1985) .......... 27

*Daileader v. Certain Underwriters at Lloyd's London - Syndicate 1861*,
670 F. Supp. 3d 12 (S.D.N.Y. 2023) .......... 14

*Diaconx Corp. v. Hamilton Bank (In re Diaconx Corp.)*,
69 B.R. 343 (Bankr. E.D. Pa. 1987) .......... 23

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009) .......... 27

*Foulke v. Foulke*,
896 F. Supp. 158 (S.D.N.Y. 1995) .......... 28, 30

*Fredericks v. Chemipal, Ltd.*,
No. 06 Civ. 966, 2007 WL 1310160 (S.D.N.Y. May 3, 2007) .......... 20

*Go-Mart, Inc. v. Bazell (In re Bazell)*,
677 B.R. 836 (Bankr. S.D. Ohio 2026) .......... 27

*Harder v. Premierwest Bank (In re Harder)*,
413 B.R. 827 (Bankr. D. Or. 2009) .......... 8

*In re AMR Corp.*,
502 B.R. 23 (Bankr. S.D.N.Y. 2013) .......... 5, 13

Table of Authorities
(continued)

Page

*In re Bestwall LLC*,
71 F.4th 168 (4th Cir. 2023) ....................7

*In re Calpine Corp.*,
365 B.R. 401 (S.D.N.Y. 2007) ....................7

*In re Chateaugay Corp.*,
76 B.R. 945 (S.D.N.Y. 1987) ....................23

*In re Corben*,
667 B.R. 791 (Bankr. S.D.N.Y. 2025) ....................34

*In re Felberman*,
196 B.R. 678 (Bankr. S.D.N.Y. 1995) ....................33

*In re Grand Jury Proc.*,
219 F.3d 175 (2d Cir. 2000) ....................29

*In re Granite Partners, L.P.*,
219 B.R. 22 (Bankr. S.D.N.Y. 1998) ....................20

*In re Graziane*,
166 F. Supp. 516 (N.D.N.Y. 1958) ....................19

*In re JJ Arch LLC*,
No. 24-CV-08649, 2026 WL 1622865 (S.D.N.Y. June 5, 2026) ....................8, 34

*In re JJ Arch LLC*,
24-10381, 2024 WL 2933427 (Bankr. S.D.N.Y. June 10, 2024) ....................31

*In re JJ Arch LLC*,
663 B.R. 258 (Bankr. S.D.N.Y. 2024) ....................8, 12, 31

*In re Lomas Fin. Corp.*,
117 B.R. 64 (S.D.N.Y. 1990) ....................22

*In re Lucarelli*,
517 B.R. 41 (Bankr. D. Conn. 2014) ....................8

*In re McCormick*,
381 B.R. 594 (Bankr. S.D.N.Y. 2008) ....................15

*In re Nuovo Ciao-Di LLC*,
No. 23-10068, 2023 WL 6202467 (Bankr. S.D.N.Y. Sept. 22, 2023) ....................8

Table of Authorities
(continued)

Page

*In re Wolf Fin. Grp., Inc.*,
No. 94-8884A, 1994 WL 913278 (Bankr. S.D.N.Y. Dec. 15, 1994) ........................................5

*Kaufman v. Eli Lilly & Co.*,
65 N.Y.2d 449 (1985) ........................................26

*Mut. Fund Opt-Out Plaintiffs v. Calamari*,
181 F.4th 236 (2d Cir. 2026) ........................................28, 34

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ........................................18

*Purdue Pharma L.P. v Mass. (In re Purdue Pharma L.P.)*,
666 B.R. 461 (Bankr. S.D.N.Y. 2024) ........................................6, 7

*Queenie, Ltd. v. Nygard Int'l*,
321 F.3d 282 (2d Cir. 2003) ........................................6, 14, 15

*Reynolds Sec., Inc. v. Underwriters Bank & Tr. Co.*,
44 N.Y.2d 568 (1978) ........................................26

*Robertson v. N.B.A.*,
No. 70 CIV. 1526, 1976 WL 1220 (S.D.N.Y. Mar. 3, 1976) ........................................35

*Rojas v. Romanoff*,
186 A.D.3d 103 (1st Dep't. 2020) ........................................26

*Rokina Optical Co. v. Camera King, Inc.*,
63 N.Y.2d 728 (1984) ........................................26

*Roman Cath. Diocese of Rockville Ctr. v. Ark320 Doe (In re Roman Cath. Diocese of Rockville Ctr.)*,
651 B.R. 622 (Bankr. S.D.N.Y. 2023) ........................................6, 7, 13, 34

*Royal Park Invs. v. U.S. Bank Nat'l Ass'n*,
319 F.R.D. 122 (S.D.N.Y. 2016) ........................................29

*S.E.C. v. Brennan*,
230 F.3d 65 (2d Cir. 2000) ........................................28

*Sampson v. Murray*,
415 U.S. 61 (1974) ........................................25

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
490 B.R. 59 (S.D.N.Y. 2013) ........................................6

Page

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
501 B.R. 26 (S.D.N.Y. 2013) ........ 20

*Simpson v. Chassen*,
No. 25-CV-04004, 2025 WL 1784931 (S.D.N.Y. June 27, 2025) ........ 31

*Simpson v. Chassen*,
No. 25-CV-04004, 2026 WL 1584643 (S.D.N.Y. June 3, 2026) ........ 12, 31

*Vyshedsky v. Soliman (In re Soliman)*,
515 B.R. 179 (Bankr. S.D.N.Y. 2014) ........ 26

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008) ........ 5, 28

*Woodson v. Mendon Leasing Corp.*,
100 N.Y.2d 62 (2003) ........ 26

STATUTES

11 U.S.C. § 105(a) ........ 6, 34

11 U.S.C. § 550 ........ 20

11 U.S.C. § 1112(b)(4)(A) ........ 9

11 U.S.C. § 1129(a)(3) ........ 8

11 U.S.C. § 1129(a)(7) ........ 7

11 U.S.C. § 1129(a)(15) ........ 1, 7, 8

28 U.S.C. § 2283 ........ 34

N.Y. C.P.L.R. 321(a) ........ 24

N.Y. C.P.L.R. 3012(d) ........ 26

N.Y. C.P.L.R. 5015(a)(1) ........ 26

OTHER AUTHORITIES

Bankr. Evid. Manual § 301:47 (West 2025) ........ 5, 6

Hon. Mark C. Dillon, Practice Commentaries, McKinney's Cons. Laws ........ 26

Table of Authorities
(continued)

Page

Tammy E. Hinshaw & Judith N. Morris, 5A Carmody-Wait New York Practice with Forms 2d, § 30:10 ....................26

Defendants Arch Real Estate Holdings LLC, Arch Asset Management LLC, and Arch Property Management LLC (collectively the "Arch Entities" or "Defendants"), by and through their undersigned counsel, submit the following Memorandum of Law in Opposition to the motion of Plaintiff Jeffrey Solomon Simpson (the "Debtor" or "Mr. Simpson") for a preliminary injunction enjoining Defendants from continuing an action in the Supreme Court of the State of New York, County of New York, Index No. 653216/2026 (the "State Court Action").[1]

## INTRODUCTION

1. The Debtor's motion (ECF No. 2,[2] the "Motion") seeks the extraordinary remedy of a preliminary injunction to halt the State Court Action from proceeding against non-debtor entities and individuals. The Motion should be denied because the Debtor cannot satisfy any element of the preliminary injunction standard.

2. The Debtor cannot demonstrate a likelihood of a successful reorganization. The Debtor has provided no liquidation analysis, draft plan, disclosure statement, or any other support beyond a bare recitation to 11 U.S.C. § 1129(a)(15) and for this reason alone, the Motion must fail. Moreover, the record reflects continuing losses, escalating administrative expenses, persistent violations of court orders, and no realistic path toward confirming a chapter 11 plan. Rather than preserving the estate's assets or advancing reorganization, this adversary proceeding has generated yet another layer of costly and distracting litigation.

3. Most fundamentally, the Debtor cannot establish irreparable harm. The State Court Action is directed at non-debtors, and the Debtor has not shown that its continuation will result in the sort of immediate adverse economic consequence to his estate as required by Second Circuit

---

[1] The Defendants do not consent to entry of final orders or judgment by the bankruptcy court.

[2] Cites to "ECF No." refer to docket entries in the instant adversary proceeding, No. 26-01097 (LGB). Cites to "Bankr. ECF No." refer to docket entries in the larger bankruptcy case, No. 26-10359 (LGB).

law. Nor can the Debtor reconcile his current position with prior representations to this Court, in which he and his counsel emphasized the separateness of several of the very entities he now claims are so intertwined with his estate that litigation concerning them must be enjoined.

4. The balance of equities and public interest also weigh strongly against issuing the injunction, and the timing and substance of the Motion reflect yet another attempt by the Debtor to divert disputes away from the forum in which they are already pending and to interfere with the orderly adjudication of claims against non-debtors. By any objective measure, the resources the Debtor is devoting to prosecuting this Motion far exceed what it would have cost the non-debtor defendants to have simply answered or joined in the pending motion to dismiss the State Court Action.

5. Bankruptcy is intended to facilitate a debtor's good faith reorganization and preserve value for creditors. It is not to provide a vehicle for forum shopping or co-opting of any state-court proceedings that a debtor finds objectionable.

6. Because the Debtor has not come close to the clear and particularized showing required for the extraordinary relief he seeks, even having been given the benefit of supplementing the record, the Motion must be denied and the Court's Temporary Restraining Order dissolved.

## FACTUAL BACKGROUND[3]

7. The instant Motion concerns the State Court Action commenced by the Arch Entities on June 1, 2026. with the operative complaint (ECF No. 1-1, the "FAC") filed on June 5, 2026. The State Court Action seeks to impose contract liability, or, in the alternative, unjust

[3] The Debtor's complaint (ECF No. 1, the "Complaint"), the Motion, and several supporting declarations contain extensive factual allegations that are not material to the issues presented by the Debtor's preliminary injunction application or otherwise concern the subject matter of this adversary proceeding. Defendants therefore do not address those allegations herein. By foregoing a point-by-point response, Defendants do not concede the accuracy of the Debtor's allegations and expressly reserve all rights to contest them in the appropriate posture and proceeding.

enrichment liability, on YJ Simco LLC ("YJ Simco") and five special purpose vehicles or "SPVs"—1055 Park Ave 1 LLC ("Park 1"), 1055 Park Ave PH LLC ("Park PH"), 1055 Park Ave ST LLC ("Park ST"), 1055 Park Ave 4 LLC ("Park 4") and 266 WMTR LLC ("WMTR") (collectively with YJ Simco, the "Contract Defendants") based on the Contract Defendants' failure to compensate the Arch Entities for extensive property, asset, and bookkeeping management services provided to them over a multi-year period as required under the relevant Operating Agreement. (FAC at ¶¶ 2–4, 18–19, 62–74). The FAC seeks compensatory and consequential damages in an amount to be determined at trial, identifying $550,000 as a 2 percent per-annum market-rate benchmark, plus interest and costs. (*Id.* ¶¶ 67, 74; *id.* at 21–22 (Prayer for Relief)).[4]

8. The State Court Action also alleges that the Debtor, though not a defendant, orchestrated insider transfers, including transferring YJ Simco's membership interests in Park ST and Park 4 to his wife, defendant Yael Simpson, who then caused Park ST to deliver a mortgage and guaranty in favor of defendant Becker, Glynn, Muffly, Chassin & Hosinski, LLP ("Becker Glynn") to secure payment for the Debtor's bankruptcy counsel. (*Id.* ¶¶ 3, 6–7, 29–32, 34–35). The Arch Entities contend that these alleged transactions were undertaken without reasonably equivalent value and with intent to delay, defraud, and harm creditors, and they seek to avoid transfers of membership interests and the Park ST mortgage and guaranty. (*Id.* ¶¶ 3–7, 42). The FAC alleges that, in reality, contribution agreements executed on October 31, 2021 transferred

[4] At the September 28 conference, the Court expressed skepticism regarding the FAC's damages assertions, observing that the alleged damages could not be "hundreds of thousands of dollars" because "[s]ome of these entities don't operate. They don't do anything." (ECF No. 12-1, the "9/28/26 Conf. Trans." at 38:25–39:19). The $550,000 figure put forward in the FAC merely serves merely as a reference point to reflect the potential market rate contemplated by the Arch Entities' operating agreement, multiplied over time. The FAC does not seek a fixed damages award of $550,000; rather, it seeks contract damages in an amount to be determined at trial, the calculation of which will likely require expert testimony. (FAC ¶¶ 67, 74; *id.* at 21–22 (Prayer for Relief)). At the pleading stage, the Arch Entities are not required to quantify their damages with precision, but need only allege facts from which damages resulting from the Contract Defendants' breach may reasonably be inferred. *CAE Indus. Ltd. v. KPMG Peat Marwick*, 193 A.D.2d 470, 473 (1st Dep't. 1993).

100% of the SPV membership interests from the Debtor and Yael Simpson to YJ Simco, and that a subsequent course-of-dealing reflects YJ Simco's ownership of the SPVs. (*Id.* ¶¶ 20–25).

9. Based on those allegations, the Arch Entities seek a declaration that YJ Simco owns 100% of the membership interests in Park ST and Park 4, that any purported transfers to Yael Simpson are ineffective or are voidable, and that the Park ST mortgage and guaranty are void or otherwise voidable. (*Id.* ¶¶ 75–80). The FAC further asserts claims for fraudulent transfer under New York Debtor and Creditor Law sections 273(a)(1), 273(a)(2), and 274(a) and seeks attorneys' fees under section 276-a. (*Id.* ¶¶ 81–99).

10. The deadline to respond to the FAC expired, at the latest, on July 9, 2026. Apart from Becker Glynn, none of the defendants answered or moved against the FAC. The Arch Entities thereafter moved for a default judgment on September 3, 2026 (ECF No. 2-3), nearly two months after the response deadline had passed. The motion was made returnable on October 6, 2026, as negotiated by Becker Glynn. Nearly four months after the State Court Action was filed, and more than three weeks after the default motion was filed, the Debtor filed this adversary proceeding and moved for emergency injunctive relief to enjoin Defendants from continuing to prosecute the State Court Action. The State Court Action is presently stayed pursuant to the Court's Temporary Restraining Order (ECF No. 7, the "TRO") entered on September 29, 2026.

11. The TRO allowed the Debtor to supplement the Motion with additional filings and declarations by October 9, 2026. On October 8, the Debtor supplemented the Motion with (1) Debtor's Local Rule 1007-2 declaration, originally submitted on February 19, 2026 in the bankruptcy case (ECF No. 13-1; Bankr. ECF No. 3), which largely rehashes factual allegations regarding the global dispute with 608941 NJ Inc. ("Oak") and the Wiener family, (2) a declaration from Yael Simpson regarding the purported distraction to the Debtor caused by the underlying

State Court Action (ECF No. 13-2, the "Y. Simpson Decl."), (3) a declaration from the Debtor's Aunt, Sima Berner Reid, regarding the purported efforts of the Wiener family to "destroy" the Debtor and "everything [he] built for himself and his family," (ECF No. 13-3 ¶ 8) and (4) Becker Glynn's memorandum of law opposing the Arch Entities' default motion filed in the State Court Action (ECF No. 13-4).[5]

## LEGAL STANDARD

12. Federal Rule of Bankruptcy Procedure 7065 incorporates Federal Rule of Civil Procedure 65 in adversary proceedings. *In re AMR Corp.*, 502 B.R. 23, 32 (Bankr. S.D.N.Y. 2013); Fed. R. Bankr. P. 7065. Under that standard, "a plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). Emergency injunctive relief is an "extraordinary and drastic remedy" available only upon a "clear showing" that the movant has "carrie[d] the burden of persuasion." *In re AMR Corp.*, 502 B.R. at 32 (internal quotation marks omitted); *see also In re Wolf Fin. Grp., Inc.,* No. 94-8884A, 1994 WL 913278, at *3 (Bankr. S.D.N.Y. Dec. 15, 1994) ("Movant must establish a clear and unequivocal right" to emergency injunctive relief); Bankr. Evid. Manual § 301:47 (West 2025) ("[T]he burden is on the party seeking injunctive relief to establish with persuasive evidence that the extraordinary remedy is warranted.").

[5] Defendants respectfully submit that significant portions of the materials the Debtor submitted in support of the Motion are inadmissible and should be given no weight, including because they consist of irrelevant and prejudicial factual assertions concerning non-parties, hearsay, and references to confidential settlement discussions. By referring to such materials in this memorandum, Defendants do not waive, and expressly preserve, all objections to their admissibility and consideration, and intend to raise these objections at the evidentiary hearing.

13. In addition, courts have interpreted section 105(a) of the Bankruptcy Code to authorize bankruptcy courts to enjoin litigation against a non-debtor "when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate." *Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287–88 (2d Cir. 2003); *Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 490 B.R. 59, 65 (S.D.N.Y. 2013), *aff'd sub nom. Picard v. Fairfield Greenwich Ltd.*, 762 F.3d 199 (2d Cir. 2014). Courts applying section 105(a) generally analyze requests for such relief through the framework of Rule 65, recognizing that "there should hardly ever be a situation where an injunction is warranted under [section 105(a)] but not [Rule 65]." *Roman Cath. Diocese of Rockville Ctr. v. Ark320 Doe (In re Roman Cath. Diocese of Rockville Ctr.)*, 651 B.R. 622, 650 (Bankr. S.D.N.Y. 2023). Accordingly, the risk of immediate harm to the debtor's estate is typically evaluated as part of the movant's burden to establish irreparable harm under Rule 65. *See id.*; *AIG Europe, S.A. v. Sears Holding Corp. (In re Sears Holding Corp.)*, 659 B.R. 236, 251 (Bankr. S.D.N.Y. 2024); *Purdue Pharma L.P. v Mass. (In re Purdue Pharma L.P.)*, 666 B.R. 461, 470–71 (Bankr. S.D.N.Y. 2024).

## ARGUMENT

### I. The Debtor Cannot Demonstrate a Likelihood of a Successful Reorganization

#### A. The Debtor Has Not Met His Burden to Show a Plan Will Be Confirmed

14. As the Debtor explicitly acknowledges, the pertinent inquiry under the first preliminary injunction factor is whether the Debtor can demonstrate a likelihood of successfully reorganizing. (Motion ¶ 51).[6] "Normally, the 'merits' in litigation are the resolution of an

[6] At the September 28 conference, the Court expressed skepticism regarding Defendants' ability to demonstrate a likelihood of success in the State Court Action and suggested that Defendants should be prepared to address those criticisms at the evidentiary hearing. (9/28/26 Conf. Trans. at 30:19–36:18). Defendants respectfully submit that their likelihood of success on the merits in the State Court Action is not a relevant inquiry for purposes of the Debtor's Motion, and the law requires no such showing. On the contrary, the well-settled rule is that the *movant* bears the burden of establishing all four elements of the preliminary injunction standard. Bankr. Evid. Manual § 301:47 ("It is

underlying civil dispute. But in a chapter 11 bankruptcy, the focus is not on resolving a particular dispute but rather on the debtor's rehabilitation and reorganization." *In re Purdue Pharma L.P.*, 666 B.R. at 469 (quoting *In re Bestwall LLC*, 71 F.4th 168, 184 (4th Cir. 2023)); *accord In re Roman Cath. Diocese*, 651 B.R. at 649; *In re Calpine Corp.*, 365 B.R. 401, 409 (S.D.N.Y. 2007).

15. To support such a finding, the Debtor argues only that (1) his required showing under Bankruptcy Code section 1129(a)(15)(B) "should easily be met" from the value of the plan's assets or from his future income, (2) that he "has been sent for his review and comments a draft chapter 11 plan and drafts of objections to four proofs of claim, which represents the first set of objections to claims," (3) that the injunction will allow the Debtor to "devote his time and energy to proposing, confirming, and consummating a chapter 11 plan, and reducing the amount and number of allowed claims entitled to distribution under such plan," and (4) that "[s]uch plan will be confirmable within a reasonable period of time." (Motion ¶¶ 50, 52; ECF No. 3, "Debtor Decl.," ¶ 27). Apart from his Rule 1007-2 declaration originally submitted on February 19, 2026 (ECF No. 13-1; Bankr. ECF No. 3), the Debtor offered no additional evidence or argument on this issue in his supplemental submissions. These conclusory assertions fall well short of establishing a realistic prospect of reorganization and, therefore, do not satisfy the Debtor's burden of demonstrating that the injunction advances the "merits" of this chapter 11 case.

16. As for success of plan confirmation, the Debtor has failed to meet his burden as a mere cite to section 1129(a)(15) is woefully insufficient. Any plan must pass the "best interests of creditors" test under a hypothetical liquidation pursuant to Bankruptcy Code section 1129(a)(7) and the Debtor has not provided any liquidation analysis, nor any draft plan or disclosure

the burden of the party seeking a preliminary injunction to show that it is entitled to one, *not the burden of the other party to show that the movant is not entitled.*" (emphasis added)).

statement. For that reason alone, the Debtor failed to meet his burden. *See In re Nuovo Ciao-Di LLC*, No. 23-10068, 2023 WL 6202467, at *6 (Bankr. S.D.N.Y. Sept. 22, 2023) (no likelihood of success where exclusivity period expired without the debtor filing a plan, creditor filed a liquidation plan, and debtor's reports showed only a $53 cash balance); *Harder v. Premierwest Bank (In re Harder)*, 413 B.R. 827, 835–38 (Bankr. D. Or. 2009) (no likelihood of success where individual debtor who had transferred his interests in certain entities on eve of bankruptcy had not submitted a plan or demonstrated sufficient assets). Additionally, under the "majority view" (also referred to as the narrow view), in case of a cramdown under section 1129(b) of the Bankruptcy Code, section 1129(a)(15) does not eviscerate the absolute priority rule and a debtor's corresponding duty to liquidate all of his assets (subject to exemptions). *See In re Lucarelli*, 517 B.R. 41, 48–52 (Bankr. D. Conn. 2014) (following the four circuit courts that decided the matter). The Debtor offers no evidence of readiness to liquidate or provide rationale as to why the majority rule should not be followed here. The Debtor has not even offered evidence as to how any plan will be offered in good faith as required by section 1129(a)(3) of the Bankruptcy Code.

17. Instead, the present record suggests a substantial risk of conversion or dismissal. "A court must convert or dismiss a bankruptcy where 'cause' exists so long as [conversion or dismissal] is in the best interest of both the creditors and the estate." *In re JJ Arch LLC.*, 663 B.R. 258, 275 (Bankr. S.D.N.Y. 2024) (citations omitted), *motion for relief from judgment denied*, *In re JJ Arch LLC*, 676 B.R. 675 (Bankr. S.D.N.Y. 2025), and *aff'd, In re JJ Arch LLC*, No. 24-CV-08649, 2026 WL 1622865 (S.D.N.Y. June 5, 2026). The Bankruptcy Court dismissed the JJ Arch case, filed by Mr. Simpson in violation of court orders, based on substantial or continuing loss to and diminution of the estate, the absence of a reasonable likelihood of rehabilitation, gross

mismanagement, and bad faith. *Id.* at 275–88. Unsurprisingly, those same hallmarks are also present in Mr. Simpson's personal bankruptcy case.

### B. The Record Instead Supports that Conversion or Dismissal is Likely

#### 1. The Debtor's Estate is Suffering Continuing Diminution with No Reasonable Likelihood of Rehabilitation

18. There can be no doubt here that the Debtor's estate is suffering a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." 11 U.S.C. § 1112(b)(4)(A). The Debtor's five-month monthly operating report ("MOR") record reveals an estate in financial decline (*See* Bankr. ECF Nos. 38 (February 2026), 67 (March 2026), 90 (April 2026), 155 (May 2026), 158 (June 2026)). After showing nominal positive cash flow in March and April, the Debtor's estate gained a marginal profit of just $1,474 in May before recording a net loss of $870 in June, ending the month with only $8,805 in cash on hand. Even the five-month cumulative net positive cash flow of $12,942 drastically understates the estate's true financial distress: of the $143,509 in total disbursements, $42,658 (29.7%) were unexplained withdrawals and approximately $24,335 fell into peer-to-peer transfers via Venmo, Apple Cash, and Zelle.

19. Unpaid administrative expenses totaled approximately $500,503 as of June 30, 2026, representing an administrative expense obligation that is more than fifty times the estate's available cash as of the end of June 2026. (Bankr. ECF No. 158; Declaration of Jonathan T. Koevary ("Koevary Decl.") Exhibit A). The Debtor himself acknowledged that approximately $600,000 had been spent as of September 11, 2026, with "nothing to show for it," (Bankr. ECF No. 165-1 at 13), and the most recent invoice produced by the Debtor reflects that Becker Glynn has incurred $664,168.85 in fees through August 31, 2026. (Koevary Decl. Exhibit B). Given the inevitable additional fees associated with commencing and litigating this action, the estate's

current administrative-expense burden is almost certainly significantly higher than the amounts reflected in the existing record. Meanwhile, selling expenses, which were $0 in every month from February through April, suddenly were reported at $7,512 in May and tripled to $21,500 in June, with no explanation.

20. The claims-to-assets ratio in this case is overwhelming. Thirty claims—with twenty-eight remaining pending—totaling approximately $175 million have been filed against an estate with reported assets of $3,818,843.96, (Bankr. ECF No. 20), representing approximately 2% of the claim amounts. The Debtor's income barely covers his operating costs, and it is indisputable that, even if a substantial portion of the $175 million in filed claims are reduced in amount, the Debtor cannot meaningfully provide for distributions to creditors from his monthly business income.

2. The Debtor has Engaged in Gross Mismanagement and Violations of Fiduciary Obligations

21. The record in this case also reveals a pattern of mismanagement, misrepresentation, and disregard for the Debtor's fiduciary obligations as a debtor in possession. For one, the Debtor's reporting of liabilities has been materially inaccurate across every reporting period. The February MOR reported $61,729,000 in prepetition unsecured debt, and every MOR from March through June has reported $0 in total prepetition liabilities—secured, priority, and unsecured—despite the fact that creditors have filed more than $175 million in claims against the Debtor's estate. Professional fees have been left blank in every MOR despite Becker Glynn's accrual of approximately $500,503 in approved fees as of the end of June. These are not minor discrepancies or inadvertent errors; they are material misstatements and omissions that render the MORs unreliable as a tool for monitoring the estate's financial condition.

22. Additionally, though it is now October 21, the Debtor has yet to file MORs for July, August, or September, notwithstanding that MORs are required to be filed "no later than the 21st day of the month immediately following the reporting period covered by the MOR." 28 C.F.R. § 58.8 (e). Section 1112(b)(4)(F) of the Bankruptcy Code recognizes the "unexcused failure to satisfy timely any filing or reporting requirement" as cause for conversion or dismissal.

23. Further, as noted above, the Debtor's bank statements reveal $42,658 in unexplained cash withdrawals from March through June ($4,250 in March, $12,400 in April, $6,508 in May, and $19,500 in June), representing approximately 29.7% of total five-month disbursements. These withdrawals, each labeled merely "DEBIT," are accompanied by no payee information, no narrative description, and no supporting documentation. A debtor in possession who engages in substantial undocumented cash transactions is acting in a manner fundamentally inconsistent with his fiduciary obligations to the estate and its creditors.

24. The Debtor's bank statements across all five months for which he filed MORs also reflect unexplained and unbudgeted personal spending from estate accounts, including over $24,000 in peer-to-peer transfers through Venmo, Apple Cash, and Zelle to unidentified payees. In addition, numerous disbursements fell into spending categories entirely unbudgeted on the Debtor's Form 122B or Schedule J, such as private school tuition payments of $1,027.94.

25. Though the Debtor reported $0 in income for 2024, he was somehow able to continue operating a business, maintain a residence at 1055 Park Avenue in Manhattan, and file for bankruptcy protection. The Statement of Financial Affairs (Bankr. ECF No. 22) reflects income of only $15,000 in 2026 (through the filing date) and $40,000 in all of 2025. These figures are irreconcilable with the Debtor's lifestyle and spending patterns and suggest either that substantial income has gone unreported or that the Debtor has been living off undisclosed sources of funds.

3. <u>The Debtor Has Demonstrated Bad Faith and an Inability to Follow Court Orders</u>

26. A finding of bad faith "depends upon the totality of the circumstances, and involves finding an intent to abuse the judicial process, and the purpose of the reorganization process." *In re JJ Arch LLC.*, 663 B.R. at 281 (internal quotation marks omitted). In the *JJ Arch* case, Judge Mastando found that that bankruptcy case, which was brought by Mr. Simpson, "was not filed in order to rehabilitate or liquidate to a good-faith debtor, and was instead an attempt by Mr. Simpson to avoid the resolution of . . . governance issues" before Justice Cohen, and that "there was no reasonable possibility that the Debtor emerge from bankruptcy which, in turn, compels a finding of bad faith." *Id.* at 283, 288 (internal quotation marks and alteration omitted).

27. Here too, rather than focusing estate resources on creditor recoveries or plan formulation, the Debtor has devoted substantial resources to collateral litigation and disputes arising from his broader grievances with third parties. The filing of this adversary proceeding, seeking to enjoin a pending state-court action against non-debtors, is merely the latest example of this bad faith conduct. The result is an estate characterized by mounting administrative expenses and no identifiable progress toward confirmation.

28. As described further in Part III below, Courts have repeatedly recognized the Debtor's pattern of using bankruptcy and federal litigation to interfere with state-court proceedings in bad faith. In denying relief from an anti-removal injunction, District Judge Vargas cited the Debtor's "baseless attempts to remove [another state court action] to federal court," his "repeated and frivolous efforts to delay state court proceedings," and "his threats to file for personal bankruptcy to thwart state court jurisdiction," concluding that permitting such conduct "would make a mockery of the Court." *Simpson v. Chassen*, No. 25-CV-04004, 2026 WL 1584643, at *2 (S.D.N.Y. June 3, 2026) (internal quotation marks omitted).

29. The Debtor's repeated violations of this Court's Cease and Desist Order independently underscore the absence of a realistic prospect for reorganization. A chapter 11 debtor-in-possession serves as a fiduciary and is expected to comply with court orders and discharge the obligations imposed by the Bankruptcy Code. Yet the Debtor has repeatedly demonstrated the opposite.

30. In communications sent in violation of this Court's orders, the Debtor expressly stated that he would continue his conduct regardless of "some stupid order" imposed by this Court or "get[ting] the [U.S.] Marshals involved." (Bankr. ECF 165-1 at 9–10). These statements are not merely troubling. They call into question the Debtor's willingness and ability to comply with future orders of this Court, including any confirmation order.

***

31. Taken together, the record does not support a finding that the Debtor is likely to achieve a successful reorganization. Instead, it reflects the same factors that led to the dismissal of the JJ Arch bankruptcy case: continuing loss and diminution of the estate's assets, escalating administrative expenses, litigation-driven bad faith objectives disconnected from maximizing creditor recovery, and persistent disregard of court orders. On this record, the Debtor has not carried his burden of demonstrating a likelihood of success on the merits, which here, as conceded in the Motion, means a likelihood of a successful reorganization.

## II. <u>There Is No Imminent Irreparable Harm</u>

32. Emergency injunctive relief is available only upon a showing of "imminent irreparable harm to the estate in the absence of an injunction." (Motion ¶ 51); *see In re Roman Cath. Diocese*, 651 B.R. at 654. Irreparable harm is "the most important prerequisite for injunctive relief." *In re: AMR Corp.*, 502 B.R. at 33. The asserted harm must be actual and imminent, not remote or speculative, and the movant must make a specific and concrete showing that such harm

will occur absent an injunction. *Daileader v. Certain Underwriters at Lloyd's London - Syndicate 1861*, 670 F. Supp. 3d 12, 35 (S.D.N.Y. 2023), *aff'd,* No. 23-690-CV, 2023 WL 7648381 (2d Cir. Nov. 15, 2023), and *aff'd*, 96 F.4th 351 (2d Cir. 2024). Further, because the Debtor asks this Court to halt litigation against non-debtors, he must also overcome the rule that such relief is reserved for circumstances in which the non-debtor litigation will have "an immediate adverse economic consequence for the debtor's estate." *Queenie, Ltd.*, 321 F.3d at 287 (cited at Motion ¶ 43). The Debtor cannot do so here.

### A. The Debtor Cannot Establish Harm to the Bankruptcy Estate

33. The Motion contends that the State Court Action "seeks to establish liability against the Contract Defendants who, prior to August 2023, were controlled by the Debtor, based on the Debtor's conduct" (Motion ¶ 45), asserts claims against the non-debtor Contract Defendants similar to those filed by Oak against the Debtor in another adversary proceeding (*id.*), "puts the Debtor at risk of losing his chapter 11 counsel" (*id.* ¶ 47), "seeks to impose liability on the Debtor's wife" causing his "ability and desire to devote his energy to his reorganization efforts" to be "severely and adversely affected" (*id.* ¶ 48), and "puts the Debtor at risk of losing the value of his direct and indirect equity interests in the entities" (*id.* ¶ 49). These conclusory assertions fall far short of satisfying the standard articulated in *Queenie*, which requires proof that "a claim against the non-debtor will have immediate adverse economic consequence for the debtor's estate." *Queenie, Ltd.*, 321 F.3d at 287.

34. Critically, the Debtor bears the burden of making that showing as to each non-debtor defendant individually. *See id.* at 288 (extending a stay to the debtor and its wholly owned corporation, but not to other co-defendants). The Second Circuit identified only limited circumstances in which claims against non-debtors may warrant protection under the automatic stay, including actions seeking to establish obligations guaranteed by the debtor, actions against

the debtor's insurer, and actions involving such an identity of interests that the debtor is effectively the real party defendant. *Id.* None of those circumstances is present here. Nor has the Debtor attempted to explain how any claim asserted against any particular defendant in the State Court Action will cause an immediate adverse economic consequence to his estate.

35. Moreover, a debtor's ownership interest in a non-debtor defendant, standing alone, is insufficient to satisfy *Queenie*. *See In re McCormick*, 381 B.R. 594, 602–03 (Bankr. S.D.N.Y. 2008) (declining to stay litigation against the debtor's wholly owned LLC where the debtor failed to present evidence that the action would have an immediate adverse economic consequence for his estate's ownership interest). Thus, even assuming the Debtor possesses the equity interests he claims, that fact alone does not warrant a stay. The Debtor must demonstrate a concrete and immediate economic consequence to the estate with respect to each entity. He has not done so.

1. <u>Entities in Which the Debtor Owns or Claims to Own Equity: YJ Simco and WMTR</u>

36. The Debtor owns a fifty percent interest in YJ Simco and claims a fifty percent interest in WMTR, which is disputed. But an ownership interest alone is not enough. See *McCormick*, 381 B.R. at 602–03. The Motion identifies no concrete harm that would result from the continuation of the State Court Action against those entities, much less the type of immediate adverse economic consequence required by *Queenie*.

37. Indeed, the Debtor never attempts to explain how a judgment against YJ Simco or WMTR would translate into a present injury to his estate. The inquiry under *Queenie* is not whether the Debtor can identify some ownership interest in a non-debtor entity. Rather, the Debtor must demonstrate an *immediate adverse economic consequence*, in other words, that the claims at issue threaten some economic value that would otherwise flow to his estate. *See Queenie, Ltd.*, 321 F.3d at 287. The Motion does not identify any source of realizable value that would be diminished by

the State Court Action. Nor does it explain why, absent a judgment in that action, equity from YJ Simco or WMTR would ultimately be available for distribution to the Debtor's estate. Instead, the Debtor simply assumes that any adverse judgment against those entities necessarily harms his estate. *Queenie* requires far more.

38. The existing record, moreover, undermines any such assumption. In the YJ Simco bankruptcy case, the Chapter 7 Trustee found "substantial uncertainty" regarding any ability to monetize the property owned by WMTR, among other SPVs, and further noted uncertainty arising from tax consequences and entity-level indebtedness that would have to be satisfied before any value could reach equity holders. (*In re YJ Simco*, No. 25-10437, Doc. No. 80, Trustee Report dated Dec. 15, 2025 ¶ 86). Thus, even putting aside the absence of proof from the Debtor, the record provides no basis to conclude that litigation against YJ Simco or WMTR threatens any immediate diminution in value available to the *Debtor's* estate.

39. The Debtor's assertion of harm is weaker still because the principal non-monetary relief sought in the State Court Action would unwind the purported transfers of Park ST and Park 4 to Yael Simpson from YJ Simco. Success on those claims would not diminish the value of YJ Simco. To the contrary, such a judgment would restore ownership of additional assets to YJ Simco, in which the Debtor owns a fifty-percent interest. If anything, that relief would tend to *increase*, rather than *decrease*, the value of his equity interest and could offset, or even exceed, any liability ultimately imposed on YJ Simco through the contract claims.

40. Despite bearing the burden of proving an immediate adverse economic consequence, the Debtor offers no analysis of the actual economic impact of the State Court Action on YJ Simco, WMTR, or his estate. To the contrary, the Debtor repeatedly maintains that the contract claims asserted in the State Court Action are meritless. (Debtor Decl. ¶¶ 19-20.) While

Defendants dispute that position, if the Debtor is correct, then any monetary judgment entered following the contemplated inquest should be minimal, undermining rather than supporting any claim of imminent harm to his estate. At the same time, the Debtor does not attempt to quantify the value of the assets that could be restored to YJ Simco through the fraudulent-transfer and related claims, nor does he analyze whether the recovery of those assets could offset or exceed any liability on the contract claims. Moreover, even if the Arch Entities are successful in obtaining a default judgment of $550,000 jointly and severally against the Contract Defendants, the Debtor has made no showing that such a judgment would impair equity otherwise flowing to his estate. Thus, the Debtor provides no basis for concluding that continuation of the State Court Action would diminish the value of his equity interests on a net basis; indeed, the opposite may be true. Because the Debtor has failed to demonstrate that the State Court Action threatens realizable value that would otherwise flow to his estate, he has not carried his burden under *Queenie*.

2. Entities Purportedly Transferred to Yael Simpson: Park ST and Park 4

41. The Debtor's position is even weaker with respect to Park ST and Park 4 because he has repeatedly disclaimed ownership of those entities in this Court.

42. The Debtor's schedules and subsequent testimony in connection with Becker Glynn's retention disclaim any interest in Park ST and Park 4. (Bankr. ECF No. 19 at 5; Bankr. ECF No. 42 ¶ 4). Indeed, Becker Glynn obtained approval of its retention based on representations, supported by Yael Simpson's sworn declaration, that Park ST was owned solely by Mrs. Simpson. (Complaint ¶¶ 22, 25–26; Bankr. ECF No. 55-1).

43. Consistent with those representations, the Debtor's counsel explained in reply papers supporting Becker Glynn's retention that:

> The disputed ownership of [Park ST] does not change the fact that [Park ST] is the entity that signed the guaranty and owns the unit on which the mortgage was granted. The mortgage was not on the

> membership interests of the entity. The entity itself is not in bankruptcy. No one has contended that I or my firm represents the entity or any owner of the entity or that I or my firm owes any duty to the entity or to any owner of the entity.

(Bankr. ECF No. 41 ¶ 11.)

44. Having secured relief from this Court based on the separateness of Park ST and the absence of any estate interest therein, the Debtor cannot now reverse course and claim that adjudication of ownership issues relating to Park ST or Park 4 will inflict irreparable harm on his estate. *Cf. New Hampshire v. Maine*, 532 U.S. 742, 749–51 (2001).

45. At bottom, the Debtor attempts to invoke whichever characterization of these entities best serves him in the moment. When seeking approval of Becker Glynn's retention, the Debtor and his counsel emphasized the separateness of entities such as Park ST to establish disinterestedness and avoid conflicts concerns. Now, in support of the extraordinary relief sought in the Motion, they seek to blur those same distinctions and attribute alleged harm to the Debtor's estate based on the affairs of non-debtor entities and the property interests of the Debtor's spouse.

46. *Queenie* does not permit such a result. Whatever interests Yael Simpson may possess in the SPVs, alleged harm to a non-debtor spouse's property is not harm to the Debtor's bankruptcy estate.

3. <u>Entities that Were Foreclosed Upon: Park 1 and Park PH</u>

47. The Debtor fares no better with respect to Park 1 and Park PH. Unlike YJ Simco and WMTR, the Debtor does not even claim a current ownership interest in those entities. Rather, in denying the Debtor's motion to consolidate the net assets of those entities, this Court has already recognized that those interests were foreclosed upon. (*See* Bankr. ECF No. 109).

48. Because the Debtor undisputedly no longer owns Park 1 or Park PH, litigation involving those entities cannot plausibly be said to threaten estate property. The Motion offers no

explanation how claims against entities that are no longer owned by the Debtor could produce an immediate adverse economic consequence to his estate, and none is apparent from the record.

4. Becker Glynn

49. The Debtor also contends that avoidance of the Park ST mortgage and guaranty places him at risk of losing chapter 11 counsel. (Complaint ¶ 44; Motion ¶ 47). But even setting aside the potential disinterestedness concerns presented by such arguments, the Debtor submits no evidence that Becker Glynn would withdraw if the mortgage or guaranty were avoided, that withdrawal is imminent, that replacement counsel could not be retained, or that such withdrawal would result in an immediate adverse consequence to his estate. The alleged harm is therefore entirely speculative.

50. As an initial matter, any suggestion that avoidance of the Park ST mortgage or guaranty constitutes irreparable harm cannot be reconciled with the basis upon which Becker Glynn was retained. The objections to Becker Glynn's retention focused extensively on the mortgage, the guaranty, and the disputed ownership of Park ST. (Complaint ¶ 24). The Court nevertheless approved the retention arrangement and found Becker Glynn disinterested on the understanding that Becker Glynn, not the Debtor's estate, would bear the risk that the mortgage or guaranty might later be challenged.

51. Indeed, Becker Glynn expressly represented that it understood and accepted those risks. As Mr. Ostrow stated, "I and my firm have taken a risk in going forward with the retention, including the ST LLC guaranty and mortgage." (Bankr. ECF No. 41 ¶ 14). Having secured the Court's approval of its retention on that basis, Becker Glynn cannot now backtrack on the risk it knowingly accepted or argue on behalf of the Debtor that it constitutes irreparable harm to the Debtor's estate. *See In re Graziane*, 166 F. Supp. 516, 517 (N.D.N.Y. 1958), *aff'd sub nom. McChesney v. Sims*, 267 F.2d 215 (2d Cir. 1959) (attorney who elected to accept a bond and

mortgage as security for fees could not later assert a charging lien when the mortgage proved insufficient); *Fredericks v. Chemipal, Ltd.,* No. 06 Civ. 966, 2007 WL 1310160, at *6 (S.D.N.Y. May 3, 2007) (attorney who entered contingency arrangement with client could not seek reasonable fee recovery in quantum meruit when client later settled on appeal).

52. Accordingly, the Motion raises substantial questions about whether the interests being advanced in this adversary proceeding are those of the Debtor's estate or those of Becker Glynn.[7] A principal injury identified by the Debtor is the potential impairment of the collateral securing Becker Glynn's fees. Yet the requested relief requires the Debtor's estate to expend additional resources prosecuting an adversary proceeding directed largely at preventing that result.

53. What is clear is that either (i) Becker Glynn has threatened to withdraw from the case should the mortgage and guaranty remain subject to challenge; or (ii) Becker Glynn signed papers under Rule 11 allowing its client to advance such an impression to the Court. The Court should view with skepticism an adversary proceeding brought in the name of the Debtor's estate whose primary practical effect is to shield the collateral of that estate's own counsel, particularly where counsel is itself a defendant in the underlying litigation.[8]

---

[7] To the extent the Motion is really concerned with the interests of Becker Glynn in the mortgage and guaranty, the only defendant that appeared in the State Court Action and whose motion to dismiss remains pending, any conceivable prejudice has already been addressed. Under CPLR 3215(a), the action against Becker Glynn must be severed from any default proceedings against the non-appearing defendants. N.Y. C.P.L.R. 3215(a). Consequently, Becker Glynn's position following entry of a default judgment would resemble that of a subsequent transferee under section 550 of the Bankruptcy Code, who remains entitled to assert its own defenses notwithstanding prior determinations concerning other parties. *See, e.g., Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 501 B.R. 26, 35 (S.D.N.Y. 2013). Moreover, as discussed below, a default judgment in the State Court Action would not give rise to issue preclusion with respect to Oak's nondischargeability claim or otherwise dictate the claims-allowance process in this bankruptcy case.

[8] To the extent Becker Glynn's continued representation is contingent upon preservation of its collateral, that circumstance warrants further disclosure and scrutiny concerning Becker Glynn's disinterestedness, and certainly calls into question whether Becker Glynn has a duty to supplement its retention declaration. *See generally In re Granite Partners, L.P.*, 219 B.R. 22 (Bankr. S.D.N.Y. 1998).

54. Even setting aside such issues, the Debtor has not shown that the State Court Action is the proximate cause of any threat to Becker Glynn's retention or that Becker Glynn's withdrawal would result in an immediate adverse economic consequence to his estate. The record reflects not only that Becker Glynn's representation of the Debtor has generated substantial administrative expenses for the Debtor's estate, but that there are significant tensions in the attorney-client relationship wholly independent of the mortgage or guaranty. At the August 17, 2026 hearing, for example, Mr. Ostrow represented that "there has been a total breakdown of the attorney-client relationship," that "the client fails to cooperate in the representation or otherwise renders the representation unreasonably difficult for the lawyer to carry out employment effectively," and that he had "concluded that it's impossible to go forward" with the representation. (ECF No. 5-1 at 9:17–19, 10:3–6, 10:13–15). The Debtor has likewise expressed dissatisfaction with Becker Glynn's representation, characterizing it as "$600,000 incurred and nothing to show for it" and noting that he was refusing to "incur[] another dollar for someone that won't fight for me and stand up for me and do what's necessary." (Bankr. ECF 165-1 at 13). Thus, even assuming Becker Glynn's withdrawal were a realistic possibility, the Debtor has failed to establish that any such withdrawal would result from the State Court Action, as opposed to the longstanding disputes and breakdown in the attorney-client relationship reflected elsewhere in the record. Nor has he shown that withdrawal would inflict an immediate economic injury on his estate, particularly given the substantial administrative expenses associated with Becker Glynn's continued representation.

5. <u>Yael Simpson</u>

55. The Debtor also claims that the State Court Action's claims against his wife have affected his "ability and desire to devote his energy to his reorganization efforts" and his ability "to support and protect his wife and his family." (Complaint ¶¶ 45–46.) These harms are personal, not injuries to the bankruptcy estate. Neither allegation justifies the extraordinary relief he seeks.

56. The Debtor is not a party to the State Court Action, has not been served with discovery, and is not required to participate in the pending default proceedings in any respect. Yael Simpson is an independent, non-debtor defendant against whom the Arch Entities are entitled to pursue claims. Any stress, concern, or distraction the Debtor experiences due to claims asserted against his spouse[9] is a personal consequence of that litigation, not an injury to the bankruptcy estate capable of supporting injunctive relief. *See In re Roman Cath. Diocese*, 651 B.R. at 662–64.

57. At the TRO hearing, the Debtor's counsel attempted to analogize the Debtor's alleged distraction to decisions staying litigation against non-debtors where continued litigation would divert personnel essential to a corporate debtor's reorganization efforts. The comparison is misplaced. Those cases involved concrete evidence that ongoing litigation would materially interfere with critical restructuring functions by consuming the time and attention of individuals whose participation was indispensable to the reorganization process. *See, e.g.*, *In re Calpine Corp.*, 365 B.R. at 410–12 (S.D.N.Y. 2007) (evidence that certain technical employees, who were "integral and indispensable" to the restructuring effort, were the only individuals who could meaningfully comprehend highly-technical discovery produced in the underlying litigation); *In re Lomas Fin. Corp.,* 117 B.R. 64, 67 (S.D.N.Y. 1990) (noting that compliance with extensive discovery requests would significantly burden numerous employees involved in the debtor's operations and reorganization).

58. A debtor seeking emergency injunctive relief must do more than speculate that litigation may prove personally distracting. As courts in this Circuit have recognized, "[a] debtor

[9] It is uncontested that Yael Simpson owns a 50% equity interest in YJ Simco. Aside from any judgment for legal fees, which likely would be modest at this early stage of litigation, the principal consequence of the State Court Action as to Yael Simpson would be the transfer of Park ST and Park 4 from her purported direct ownership to YJ Simco. Assuming YJ Simco is solvent, the value of those assets would remain available to her indirectly through her 50% ownership interest, with the remaining 50% accruing to her husband. Moreover, if the Becker Glynn mortgage and guaranty are avoided, Yael Simpson would presumably share in the resulting benefit.

seeking [a preliminary injunction] must submit more than conclusory proof that lawsuits . . . will divert . . . time and resources away from the reorganization." *In re Chateaugay Corp.*, 76 B.R. 945, 949 (S.D.N.Y. 1987).

59. Courts have specifically rejected efforts to convert personal stress and concern for the well-being of family members into cognizable bankruptcy harm. In *Diaconx Corp. v. Hamilton Bank (In re Diaconx Corp.)*, 69 B.R. 343, 346 (Bankr. E.D. Pa. 1987), a chapter 11 corporate debtor sought to enjoin litigation against its non-debtor principal and his wife, arguing that the potential loss of their home through that litigation would so traumatize the principal that he would be unable to focus on the debtor's reorganization effort. The court rejected that contention, holding that the principal's personal distress did not establish irreparable harm to the debtor's reorganization. *Id.* The same principle controls here. The Debtor's assertion that litigation against his wife has diminished his "ability and desire" to devote energy to reorganization efforts is merely a variation of the argument rejected in *Diaconx*: that personal concern for a spouse's legal and financial circumstances should be treated as harm to the bankruptcy estate.

60. Here, in his supporting declaration, the Debtor offers only that "because the FAC seeks to impose liability on my wife for attorneys' fees . . . the Court can well understand that my ability and desire to devote energy to the reorganization process has been severely and adversely affected." (Debtor Decl. ¶ 25; *see* Motion ¶ 48). But the Debtor provides no evidence that the State Court Action has impaired the administration of his bankruptcy case or threatened any aspect of the reorganization process. He identifies no reorganization task that has been delayed, no deadline that has been missed, no action he has been unable to perform, and no concrete causal link between the State Court Action and any purported harm to his estate. Absent such evidence, the Debtor's

subjective assertion of distraction cannot establish irreparable harm. It is precisely the sort of conclusory assertion that *Chateaugay* rejected.

61. The Y. Simpson Declaration fares no better. Mrs. Simpson acknowledges that the principal source of strain on the Simpson family is "what happened to [the Debtor] based on the litigation in Justice Cohen's court," through which the Debtor purportedly "lost nearly all of his income and assets." (Y. Simpson Decl. ¶ 4). Thus, even by Mrs. Simpson's account, the emotional and financial hardships she describes stem primarily from circumstances other than the State Court Action sought to be stayed here. As to the State Court Action itself, Mrs. Simpson asserts only that the source of the Debtor's distraction is his efforts to secure counsel for her. (*Id.* ¶ 7). That alleged distraction stems not from any demand the litigation places on the Debtor, but from his voluntary efforts to assist his spouse in defending claims asserted against her. Mrs. Simpson is fully capable of appearing and responding in the action on her own behalf. *See* N.Y. C.P.L.R. 321(a). Unlike the employees in *Calpine* or *Lomas*, whose involvement was shown to be indispensable to the debtors' restructuring efforts, the Debtor here identifies no reason why his involvement in the State Court Action is required at all. And like the debtor in *Diaconx*, he offers no evidence that the litigation against his wife has impaired any concrete aspect of his reorganization efforts. The Debtor's claimed distraction is therefore not a cognizable injury justifying injunctive relief.

**B. <u>A Default Does Not Constitute Irreparable Harm</u>**

62. It is also important to remember that the "immediate" alleged harm the Debtor seeks to prevent through the proposed injunction—a default judgment—is the result of the non-Becker Glynn defendants' voluntary election to not defend against the State Court Action. Those defendants remain free to appear and seek relief in state court but for one reason or another have apparently chosen not to do so. Self-inflicted consequences resulting from a voluntary decision to default cannot constitute irreparable harm justifying enjoining that action.

63. The Arch Entities commenced the State Court Action on June 1, 2026 and filed the FAC on June 5, 2026. (Complaint ¶ 33). At the very latest, the non-Becker Glynn defendants' time to respond expired on July 9, 2026, meaning that they were in default as of that date. The Arch Entities' filed their default motion nearly two months later, on September 3, 2026. (Motion ¶ 40).

64. The proposed default judgment sought in the State Court Action would (i) impose a money judgment of $550,000,[10] or, alternatively, an amount to be proven via inquest, on YJ Simco, Park ST, Park 4, Park PH, Park 1, and WMTR, and (ii) grant declaratory relief concerning the ownership of Park ST and of Park 4 and the purported transfers of those interests to Yael Simpson. (Motion ¶ 42). As noted above, none of those defendants is the Debtor, nor has the Debtor shown an adequate nexus of interest between his estate and these defendants. Thus, the immediate consequence of the default motion is, at most, the prospect of a future money judgment against non-debtors and declaratory relief concerning non-debtor property interests. As the Supreme Court has recognized, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough." *Sampson v. Murray*, 415 U.S. 61, 90 (1974). A money judgment is the textbook compensable injury, and any declaratory relief entered by the state court would remain subject to challenge through ordinary state-court procedures and appellate review.

65. Nor would a default judgment have the sweeping consequences the Debtor suggests. Even if the state court were to grant the default motion, no enforceable money judgment will follow for some time. The damages sought—a "market rate" management fee and, alternatively, unjust enrichment (Complaint ¶ 34 (quoting FAC ¶ 18))—are not a "sum certain," and therefore cannot be entered by the clerk; they require an application to the court and an inquest.

[10] The default motion submits that a judgment for $550,000 is appropriate, representing a 2% per annum benchmark market rate, but alternatively asks for an inquest to determine the amount of damages. (ECF No. 2-3 at 1).

See N.Y. C.P.L.R. 3215(a); *Reynolds Sec., Inc. v. Underwriters Bank & Tr. Co.*, 44 N.Y.2d 568, 572 (1978).

66. A defaulting defendant admits liability as to the factual allegations in the complaint, but not damages, see *Rokina Optical Co. v. Camera King, Inc.*, 63 N.Y.2d 728, 730 (1984), and the state court must still satisfy itself that the complaint states a viable cause of action before granting a default. *See Woodson v. Mendon Leasing Corp.*, 100 N.Y.2d 62, 71 (2003); *see* Hon. Mark C. Dillon, Practice Commentaries, McKinney's Cons. Laws of NY, C3215:1 Basis for Default Judgment (2021) ("When the claim is not for a sum certain within the scope of CPLR 3215(a), the default against the defendant is as to liability only, pending a later inquest on the measure and amount of damages."). This "admission" of liability is not an evidentiary "admission" in the traditional sense, but rather a procedural consequence—a defaulting defendant has merely forfeited the right to contest the facts alleged. *See* Tammy E. Hinshaw & Judith N. Morris, 5A Carmody-Wait New York Practice with Forms 2d, § 30:10 ("A default in answering is not the equivalent of an answer that fails to deny the substantive allegations of the complaint"). Under New York law, a determination of liability by default generally is not considered "actually litigated" for purposes of collateral estoppel, see *Kaufman v. Eli Lilly & Co*., 65 N.Y.2d 449, 456–57 (1985), particularly where, as here, the defendants never responded to the complaint or appeared in the action, *Vyshedsky v. Soliman (In re Soliman)*, 515 B.R. 179, 186–87 (Bankr. S.D.N.Y. 2014). Nor could a default judgment in the State Court Action have a claim preclusive effect against the Debtor in the bankruptcy case, because the Debtor is not a party to the State Court Action. *Rojas v. Romanoff,* 186 A.D.3d 103, 108–09 (1st Dep't. 2020). Accordingly, a default judgment here will not affect Oak's nondischargeability claim, nor the overall claims analysis process in this case,

even if it concerns similar issues. *See Go-Mart, Inc. v. Bazell (In re Bazell),* 677 B.R. 836, 852 (Bankr. S.D. Ohio 2026).

67. The defaulting defendants also retain their remedies under New York law, including a motion to extend their time to appear upon a reasonable excuse, N.Y. C.P.L.R. 3012(d), and a motion to vacate any default judgment for excusable default, N.Y. C.P.L.R. 5015(a)(1). The prospect of a default and judgment months from now, subject to further proceedings and potential vacatur, is neither "actual" nor "imminent." *See Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009).

68. The Debtor's own delay in bringing this motion further confirms the absence of irreparable harm caused by these defaults. Although the State Court Action was filed in June 2026 and the default motion was filed on September 3, 2026, the Debtor waited until more than three weeks after the default motion was filed to seek emergency relief. Such delay "undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 277 (2d Cir. 1985) (internal quotation marks omitted). "Any harm [the Debtor] may now face is a result of [his] own dilatory conduct." *Beeman v. BGI Creditors' Liquidating Tr. (In re BGI, Inc.)*, 504 B.R. 754, 767 (S.D.N.Y. 2014) (internal alteration and quotation marks omitted) (denying stay pending appeal where no irreparable harm).

69. Again, any defaults in the State Court Action are self-imposed—the defaulting defendants could simply have answered. The Debtor's assertion that the defaulting defendants lacked funds to retain counsel (Complaint ¶ 39) is an explanation for the default to be presented, if at all, to the state court and not a harm to the Debtor's estate. The Debtor's assertion of irreparable harm depends on the litigation choices of non-debtor defendants who remain free to

appear, oppose the default motion, and seek relief in state court. That contingent circumstance does not constitute irreparable harm or form a basis to waste Debtor assets by seeking emergency relief in this Court.

## III. <u>The Balance of Equities Tips In Favor of Defendants</u>

70. Under the third preliminary injunction factor, the movant "must establish . . . that the balance of equities tips in his favor." *Winter*, 555 U.S. at 20. This means that the Debtor bears the burden of demonstrating that he "would suffer decidedly greater harm from an erroneous denial of an injunction than the defendants would suffer from an erroneous grant." *Foulke v. Foulke*, 896 F. Supp. 158, 162 (S.D.N.Y. 1995). The Debtor is unable to meet that burden.

71. The harm to the Arch Entities is concrete and immediate. The pending TRO prevents them from prosecuting claims that are ripe for adjudication in the State Court Action and from obtaining a determination of their rights in the forum where those claims properly belong. The Second Circuit recently reaffirmed the longstanding principle that "[p]roceedings in state courts should normally be allowed to continue unimpaired by intervention of the lower federal courts . . . ." *Mut. Fund Opt-Out Plaintiffs v. Calamari*, 181 F.4th 236, 244 (2d Cir. 2026) (internal quotation marks omitted). Accordingly, "[a]ny doubts as to the propriety of a federal injunction against state court proceedings should be resolved in favor of permitting the state courts to proceed in an orderly fashion to finally determine the controversy." *Id.* (quoting *Atlantic Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 297 (1970)).

72. The balance of equities also disfavors an injunction because it undermines, rather than advances, one of the principal purposes of the Bankruptcy Code's stay protections: preserving estate assets. The automatic stay exists in part to "prevent dissipation of the debtor's assets before orderly distribution to creditors can be effected." *S.E.C. v. Brennan*, 230 F.3d 65, 70 (2d Cir. 2000).

Yet allowing the State Court Action to proceed would not dissipate estate assets. The Debtor is not a party to that action, which seeks a default judgment against other defendants.

73. Maintaining the injunction, by contrast, has already generated additional expense for the Debtor's estate. The Debtor has incurred fees in commencing this adversary proceeding, filing the Motion, and submitting supporting declarations. By any measure the fees and resources incurred far exceed what it would have cost the non-debtor defendants to simply have answered the Complaint or joined in Becker Glynn's motion. Additional fees will be incurred through discovery and deposition practice,[11] reply briefing, and any merits proceedings. Indeed, the Debtor's counsel acknowledged during the October 8 discovery conference that the Debtor intends to pursue this adversary proceeding through a trial expected to involve approximately a dozen witnesses. (ECF No. 14-3 at 9:3–22). Thus, the requested injunction does not preserve estate assets; it requires the estate to spend them, while focusing the Debtor's resources and attention on prosecuting this adversary proceeding and motion practice rather than working on a confirmable

[11] Defendants served the Debtor with requests for production of documents on October 5, 2026 with a requested compliance date of October 16, 2026. (ECF No. 12-2). On October 20, 2026 the Debtor served objections and responses, (ECF No. 17-1), and produced just 39 documents, many of which consist of filings already available on the bankruptcy docket. The Debtor refused to produce documents responsive to requests concerning (1) matters imperiling the Debtor's ability to continue with counsel in this bankruptcy case, (2) the Debtor's allegation that his "ability and desire to devote energy to the reorganization process has been severely and adversely affected" by the State Court Action, and (3) his allegation that if "the injunctive relief sought by this complaint is granted, [he] will be able to devote time and energy to proposing, confirming, and consummating a chapter 11 plan" and that "[s]uch plan will be confirmable within a reasonable period of time," asserting attorney-client privilege and work product protection. (*Id.*) Because these requests seek documents directly relevant to the Debtor's assertions of irreparable harm and the prospects for a successful reorganization, and because the Debtor explicitly relies on these allegations while withholding discovery concerning them, Defendants reserve all rights, including the right to seek preclusion, an adverse inference, or other relief under the at-issue waiver doctrine. *In re Grand Jury Proc.,* 219 F.3d 175, 182 (2d Cir. 2000) ("[A] party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party."); *Royal Park Invs. v. U.S. Bank Nat'l Ass'n*, 319 F.R.D. 122, 126 (S.D.N.Y. 2016) (describing possible discovery sanctions). Additionally, Debtor's deposition is scheduled to go forward on October 22, 2026 as ordered by the Court at the October 8 conference. Defendants reserve the right to supplement this Opposition with additional facts learned in discovery.

plan. A prompt denial based on the lack of prima facie evidence in support would save estate resources.

74. The harms identified by the Debtor, in contrast, are speculative, self-inflicted, unrelated to the bankruptcy estate, and otherwise untethered to the showing the Debtor must make. As discussed above, the Debtor's asserted injuries arise from litigation against third parties, not from any interference with estate property or the reorganization process. To the extent the Debtor complains of the consequences of the State Court Action, those consequences are largely the product of strategic choices made by the defendants in that action, including the decision of the non-Becker Glynn defendants not to answer the FAC, and the decision of Becker Glynn to undertake representation secured by the mortgage and guaranty, notwithstanding the risks attendant to that arrangement.

75. The record here also strongly indicates that the Debtor filed this adversary proceeding not to protect his estate, but as an effort to circumvent the state-court forum and relitigate before this Court disputes that are already pending in state court. Both the Motion and the Complaint contain pages of factual allegations concerning the merits of a 2023 state court action filed by the Debtor, *Simpson v. Chassen*, Index No. 158055/2023 (N.Y. Sup. Ct.) (the "Corporate Control Action"), pending before Justice Cohen, notwithstanding that those allegations bear no relationship to the relief sought in the instant Motion. This adversary proceeding bears all the hallmarks of a "last minute effort to make an end run around the State court system." *Foulke*, 896 F. Supp. at 162. The Court should decline to permit the bankruptcy process to be used as a back door vehicle for that purpose.

76. Meanwhile, the defaults should be seen for what they are: the extension of the Debtor's well-documented refusal to ever appear before Justice Cohen again to his family and

entities they purportedly control. The Debtor's antagonism towards Justice Cohen and desire to forum shop is evident from his communications to this Court in which he repeatedly copies and abuses Justice Cohen. (*See e.g.,* Bankr. ECF Nos. 125, 133–134, 136, 142–144, 150, 152, 159–160, 165-1; *Simpson v. Huebscher*, Adv. Pro. No. 26-01013 (LGB) (S.D.N.Y.) at Doc. Nos. 30, 61, 63–64, 67, 69, 74, 78–79, 83–84, 86–87).

77. The Debtor's relentless forum shopping seeking to remove matters that are pending before Justice Cohen to federal court has also been recognized by both the Bankruptcy Court and District Court. The District Court (Furman, J.) previously enjoined the Debtor from removing the Corporate Control Action to federal court because of the Debtor's "vexatious history of litigation," his "vexatious conduct in state court," his repeated "baseless attempts to remove this action to federal court," and his "repeated and frivolous efforts to delay state court proceedings . . ." *Simpson v. Chassen*, No. 25-CV-04004, 2025 WL 1784931 at *2 (S.D.N.Y. June 27, 2025).

78. After the Debtor filed his personal bankruptcy case, the District Court (Vargas, J.) expressly denied the Debtor's motion seeking permission to lift Judge Furman's injunction in order to allow him to remove the Corporate Control Action to the bankruptcy court. *See Simpson*, 2026 WL 1584643. In denying permission to remove, Judge Vargas cited not only to the Debtor's lengthy history of bad-faith forum shopping but email correspondence from the Debtor to Justice Cohen just before this bankruptcy filing where he expressly threatened to file this bankruptcy to "thwart state court jurisdiction." *Id.* (citing Exhibit 1 to the Declaration of Allen Schwartz, Esq. In Opposition to Motion Seeking Relief from Anti-Removal Injunction, *Simpson v. Chassen*, Case No. 25-cv-04004 (S.D.N.Y. Jan. 24, 2026), Doc. No. 78-1).[12]

[12] Just two days after the District Court's decision barring removal, the Debtor reaffirmed this forum shopping intent while under oath, saying the "State court is full of sh[*]t . . . That's why I filed bankruptcy, you moron." *See* Bankr. ECF No. 88-1 at 563:12–16.

79. And even before the District Court issued these rulings, as summarized above, Judge Mastando determined that a chapter 11 case the Debtor previously filed was a bad faith filing filed for the purpose of forum shopping these disputes away from Justice Cohen. *In re JJ Arch LLC*., 24-10381, 2024 WL 2933427, at *15–20 (Bankr. S.D.N.Y. June 10, 2024); *In re JJ Arch LLC*, 663 B.R. at 260.

80. Plaintiff's longstanding quest to forum shop his disputes away from Justice Cohen is also evident from his conduct in the leadup to the bankruptcy filing. This includes:

- The Debtor repeatedly defying the state court's order barring email communications to the court, instead unleashing a torrent of abusive emails to the state court even after being repeatedly sanctioned by Justice Cohen. *See* Corporate Control Action at NYSCEF Doc. No. 1847, September 24, 2025 Order; *id.* at NYSCEF Doc. No. 1851, September 29, 2025 Order; *id.* at NYSCEF Doc. No. 1998, October 8, 2025 Order; *id.* at NYSCEF Doc. No. 2157, December 5, 2025 Order. After being warned that he faced having his pleadings stricken if he continued, the Debtor continued to violate these orders. *See id.* at NYSCEF Doc. Nos. 2239, 2248, 2280–2288, 2346, 2349.

- The Debtor repeatedly telling Justice Cohen that he was boycotting any proceedings that were pending before him. *Great Am. Ins. Co. vs. Arch Real Estate Holdings, LLC et al.*, Index No. 653208/2024, at NYSCEF Doc. Nos. 296, 297, 299, 300, 315, 316; *See also* Corporate Control Action at NYSCEF Doc Nos. 2126–2127; *id.* at NYSCEF Doc. No. 2134; *id.* at NYSCEF Doc. No. 2150; *id.* at NYSCEF Doc. No. 2152; *id.* at NYSCEF Doc. No. 2179; *See also id.* at NYSCEF Doc. Nos. 2239–2248; *id.* at NYSCEF Doc. Nos. 1860–1897, 1909–1911, 2126–2134, 2150, 2152–2153, 2176, 2179–2185, NYSCEF Doc. Nos. 1923–1983.

- The Debtor filing three lawsuits under 42 U.S.C. § 1983 against Justice Cohen in District Court, as well as a federal civil rights case against the court-appointed Receiver, and various counsel, in a failed effort to stop the State Court Action and the Receiver.[13]

- The Debtor telling Justice Cohen that he would not allow him to hold a status conference. *Id.* at NYSCEF Doc. No. 2285, Simpson Jan. 16, 2026 Email; *Id.* at NYSCEF Doc. No. 2281 ("There will NOT be a conference this week (or ever), on my case (in front of Cohen), that I called for until justice is served and we get clarity from people who are not biased and prejudicial. If you, Cohen, proceed you're doing at your own risk."); *Id.* at NYSCEF No. 2287.

[13] *Simpson v. New York State Unified Court System, et. al.*, Civ. No. 1:26-cv-00110 (LTS) (S.D.N.Y.); *Simpson v. Cohen et. al.*, Civ No. 1:26-cv-00193 (LTS) (S.D.N.Y.); *Simpson v. Cohen et. al.*, Civ. No. 1:26-cv-00130 (LTS) (S.D.N.Y.); *Simpson v. Wilson et. al.*, Civ. No. 2:26-cv-00125 (SJB)(ARL) (E.D.N.Y.).

- The Debtor telling Justice Cohen that he would file personal bankruptcy "to stop your absurdity" after Justice Cohen held a status conference against Plaintiff's commands. Exhibit 1 to the Declaration of Allen Schwartz, Esq. In Opposition to Motion Seeking Relief from Anti-Removal Injunction, *Simpson v. Chassen*, Case No. 25-cv-04004 (S.D.N.Y. Jan. 24, 2026), Doc. No. 78-1.[14]

81. In sum, Plaintiff could hardly make himself clearer about his intent to forum shop all matters from the purview of Justice Cohen to federal court. This very adversary proceeding results from an extension of that commitment to his family and entities they control who chose default over answering or joining Becker Glynn's motion to dismiss. Equity does not favor rewarding such forum-shopping tactics by enjoining additional claims that belong in, and are already proceeding before, the state court.

## IV. <u>The Public Interest Weighs Against an Injunction</u>

82. Finally, the public interest weighs against injunctive relief. To be sure, there is a recognized public interest in facilitating a debtor's successful reorganization. (*See* Motion ¶ 55). But for the reasons discussed above, the Debtor has failed to demonstrate that the requested injunction would advance any viable reorganization effort. Nor has the Debtor shown that continuation of the State Court Action would threaten estate assets or otherwise impair the administration of the bankruptcy case.

83. By contrast, there is a substantial public interest in preventing misuse of the bankruptcy process and ensuring that bankruptcy protections are invoked for legitimate purposes rather than as a means of delaying creditors or disrupting proceedings pending in other courts. As the Second Circuit has observed, "[s]erial filings are a badge of bad faith, as are petitions filed to forestall creditors." *Casse v. Key Bank Nat'l Ass'n. (In re Casse)*, 198 F.3d 327, 332 (2d Cir. 1999)

[14] *See also* Corporate Control Action, NYSCEF No. 2346, Feb. 11, 2026 Email.

(quoting *In re Felberman*, 196 B.R. 678, 681 (Bankr. S.D.N.Y. 1995)). Serial filers "are to be found not in the ranks of the nation's honest debtors, but among the Hannibal Lecters of current bankruptcy litigation." *Id.* Likewise, courts have recognized that limitations on stay protections may be appropriate to prevent abusive filings because such relief "fall[s] squarely within the bankruptcy courts' broad powers to enter orders necessary or appropriate to prevent an abuse of process." *In re Corben*, 667 B.R. 791, 799-800 (Bankr. S.D.N.Y. 2025) (internal quotation marks omitted).

84. Those concerns are particularly relevant here. In upholding the dismissal of the Debtor's prior bankruptcy efforts involving JJ Arch, the District Court found a record, "detailed at length" by the bankruptcy court, that supported findings of both "subjective bad faith and objective futility" that "overwhelmingly suggests that th[e] bankruptcy was a means of removing [proceedings] from the purview of Justice Cohen." *In re JJ Arch LLC*, 2026 WL 1622865, at *5, *appeal dismissed* (Oct. 1, 2026). Those findings, among the others cited above, reinforce the public interest in ensuring that the bankruptcy process is not used to relitigate or derail disputes properly pending in state court.

85. The public interest also favors preservation of assets for creditors. As this Court has recognized, "[t]here is a strong public interest in avoiding the dissipation of [estate] assets that rightfully should go to creditors or other stakeholders." *In re Roman Cath. Diocese*, 651 B.R. at 667. Here, as summarized above, the requested injunction would not preserve estate assets, as the Debtor has already incurred substantial professional fees during these proceedings. Granting extraordinary relief under these circumstances would further deplete assets that ought to be preserved for creditors.

86. Lastly, although the anti-injunction act does not apply to section 105(a) injunctions or to bankruptcy courts, see 28 U.S.C. § 2283, the Court should nonetheless be mindful of the general public policy against federal courts enjoining state-court proceedings, particularly where the requirements for section 105(a) relief have not been met. The public has an independent interest in the orderly administration of justice and in allowing disputes to proceed in the forum where they are already pending absent a compelling basis for intervention. *See Mut. Fund Opt-Out Plaintiffs*, 181 F.4th at 244; *Robertson v. N.B.A.*, No. 70 CIV. 1526, 1976 WL 1220, at *3 (S.D.N.Y. Mar. 3, 1976). On this record, the requested injunction appears directed not toward protecting the Debtor's estate, but short-circuiting the disputes before Justice Cohen. The public interest is not served by permitting this adversary proceeding to become a vehicle for forum shopping or collateral attacks on state-court litigation.

## CONCLUSION

87. WHEREFORE, Defendants respectfully pray that the motion for a preliminary injunction be denied, that the Court terminate the pending temporary restraining order, and that the Court grant Defendants such other and further relief as is just.

Dated: New York, New York
October 21, 2026

OLSHAN FROME WOLOSKY LLP

By: /s/ Jonathan T. Koevary
Jonathan T. Koevary
Ryan A. Partelow
1325 Avenue of the Americas
New York, New York 10019
(212) 451-2300

*Attorneys for Arch Real Estate Holdings LLC, Arch Asset Management LLC, and Arch Property Management LLC*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on October 21, 2026, a true and correct copy of the foregoing document was served electronically by the Court's CM/ECF system on all parties entitled to such notice.

/s/ Jonathan T. Koevary
Jonathan T. Koevary